THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES F. DUNMORE, Defendant-Appellant.

Second District   No. 2—07—0817

Opinion filed April 24, 2009.

Thomas A. Lilien and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BURKE delivered the opinion of the court:

On November 7, 2004, Alvin Thomas was fatally stabbed during a late-night brawl outside a nightclub. A jury found defendant, James F. Dunmore, guilty of first-degree murder, and the trial court imposed a 30-year prison term. See 720 ILCS 5/9—1(a)(2) (West 2006). The State's theory was that defendant used a metal blade concealed in his walking stick to inflict the wound that killed Alvin. Defendant's theory was that Horace Joiner, or any person in the fight other than defendant, could have inflicted the fatal wound, and therefore defendant could not be found guilty beyond a reasonable doubt. Horace was prosecuted in a severed proceeding.

On appeal, defendant argues that he is entitled either to a reversal of his conviction or to a new trial because (1) the evidence was insufficient to support the conviction; (2) the trial court erroneously excluded evidence that Horace told the victim "I'll kill you right now" at or around the time the victim was fatally stabbed; and (3) the charging instrument and the jury instructions on first-degree murder misstated the law. We affirm.

## FACTS

On December 8, 2004, defendant was charged with first-degree murder "in that the defendant, without legal justification, stabbed Alvin P. Thomas with a metal object, knowing such act created a strong probability of great bodily harm to Alvin P. Thomas, thereby causing the death of Alvin P. Thomas." See 720 ILCS 5/9—1(a)(2) (West 2006). The incident that resulted in the victim's death occurred outside the

Lush Heads Club on Cunningham Street in Rockford, where a private party was being held. Alvin, who had not been invited to the party, arrived at the club at 2 a.m. with his cousins Martha and Maria Thomas. They were denied admission, and the altercation escalated to the point where several party guests, including defendant and Horace, exited the club and beat Alvin. Alvin was stabbed twice on his left side, and he was transported to a hospital. Emergency surgery proved to be unsuccessful. The autopsy indicated that Alvin died from a seven-inch-deep stab wound to the chest.

Before trial, the State moved to bar the defense from eliciting testimony that Horace told the victim, "I'll kill you right now," during the fight. The trial court excluded the testimony, rejecting defendant's position that the statement was admissible either as nonhearsay or under the declaration-of-intent exception to the hearsay rule.

At trial, Martha and Maria testified to their observations of the incident. Martha testified that she had known Horace, the father of her child, for about 25 years. Martha had also known Horace's current girlfriend, Janice Powell, for about five years. Horace and Janice were in a relationship at the time Martha conceived her child with Horace. Nine months before Alvin's death, Janice had threatened to run over Martha with a car.

On Saturday, November 6, 2004, Martha hosted a party for herself at a hair salon that she owned. Martha recalled having a single alcoholic drink during the celebration, which started at 7 p.m. Alvin was drinking at the party. Martha, Alvin, and others went to a nearby bar, the Idle Inn, a short time before it closed for the night. The group decided to go to an "after hours" party that was ongoing at the Lush Heads Club. Alvin rode to the club with Martha while Maria and Denise Lambert drove in separate cars.

Upon arriving at the Lush Heads Club, Martha parked across the street with her passenger door facing the curb. Alvin exited the car and walked to the club door to ask the cost of admission. A bald black man, whom Martha identified as Jerand Powell, told Alvin the cost was $10. Martha said she would not enter. Alvin told Jerand that he would not pay the admission fee, and the two men argued. Martha noticed a man she knew and exited the car to hug him. Alvin and Jerand continued to argue. Martha grabbed Alvin's arm and urged him to return to the car. Martha apologized to Jerand and said they were leaving.

On cross-examination, Martha said that, while she was trying to coax Alvin back to the car, Horace was walking back and forth between Martha's car and the middle of the street while Janice called to him to stay away from Martha. Horace chose to stay near Martha's car. Mar-

tha admitted telling an officer that she believed Janice became jealous when Horace lingered around Martha.

Before Martha could get Alvin into the car, 20 to 25 people, including Janice, "busted out" the club and approached the car. Martha tugged Alvin's sweater and told him to run to the car. Martha sat in the driver's seat, and Alvin tried to run around the car to the passenger side. Next, Martha briefly saw Alvin on the ground with people jumping on and hitting him.

Martha testified that Janice was one of the first people to jump on and strike Alvin. Janice tried to take a walking stick from a man and, referring to Martha, said, "no, this is the bitch I want to kill." At trial, Martha identified defendant as the man with the walking stick. When defendant did not give Janice the walking stick, Janice and two of her girlfriends tried to enter Martha's car. Martha saw people all around her car; some were on the hood and others tried to enter through the windows. Martha drew a knife and waved it at her attackers.

A truck pulled up to block Martha's car, and then the truck rammed into it. The truck backed up to hit Martha's car again, but Martha pulled away from the curb. Martha made a U-turn to retrieve Alvin, who was about half a block away. Alvin got into the front passenger seat and sat with his arms at his sides. Martha reached to close Alvin's door, but Horace immediately reopened it.

As the car started to pull away, Horace struck Alvin. Martha testified that Horace "probably" hit Alvin once, and she saw nothing in Horace's hands when he did so. When Horace opened the car door, Alvin did not look toward him or try to block the blow. Martha conceded that, two days after the incident, she gave the police a written statement that "Horace opened the door and started beating on Alvin. Horace was punching him in the chest."

Martha drove away from the scene, pursuing the truck that had struck her car. Martha told Alvin to remember the truck's license plate number. When Alvin did not respond, Martha realized that he had been stabbed. Martha stopped at a phone booth to call 911 and report the truck's license plate. Maria and Denise arrived at the phone booth as Martha placed the call. An ambulance arrived and took Alvin to the hospital, where Martha spoke to the police.

Martha was taken to the police station about 5:30 a.m., where she told Detective Olson what she had seen that night. About 6:15 a.m., Martha learned that Alvin had died, and she returned to the hospital. About 6 p.m., Martha was shown a six-person photographic lineup and identified defendant as one of the people who had surrounded Alvin. Martha told Detective Olson that defendant wore a suit on the night of the incident, but she could not recall its color.

Maria's testimony mostly corroborated Martha's testimony. Maria testified that, after parking outside the club, she exited her car and asked Alvin to check the cost of admission. While Alvin talked to the man at the door, Maria saw Horace on the sidewalk near the club. Maria and Denise began arguing with Janice and some other girls about Horace. Horace told Maria that the gathering was private, and Maria said she would leave.

Horace, Janice, and the other girls walked toward the club door. Maria saw a man in a blue suit with his back to the door, holding it open. Alvin walked back to Martha, Maria, and Denise and said the party was private. The four stood next to Martha's car and talked.

At some point, Maria walked to the Lush Heads Club side of the street to speak with Richard Alexander, a friend. Martha walked over and also spoke to Alexander, who walked Martha back to her car. Maria remained in the street. Alvin was between the curb and the sidewalk. Maria heard people in the club doorway call Alvin "punks [sic]." A tall bald man wearing a gray T-shirt yelled toward Alvin, "what would he do?" The bald man ran toward Alvin and punched him in the face. Ten to twenty-five people followed the man toward Alvin.

Alvin lost his balance from the punch and fell to his hands and knees. Before Alvin could stand, the crowd began beating him. Besides the bald man, the attackers included Janice, who hit Alvin with her shoe, and a girl wearing a pink sweater, who moved her arms like she was striking Alvin with something. Standing behind Martha's car, Maria saw arms and legs kicking everywhere, and she heard a lot of yelling. Maria saw the man in the blue suit hold a four-foot-long blue cane, which had a three- to four-inch metal blade on its end. The man used it like a pool cue, jabbing it twice toward Alvin's left side. Maria did not see the blade make contact with Alvin's body or see blood on the cane or on Alvin. Maria did not recall telling Detective Swenson that she was at least 12 to 15 feet from the melee, but Swenson testified that she made that statement. Maria did not see anyone attack Martha.

After seeing the man jab his cane toward Alvin, Maria ran to her truck. As Maria made a U-turn in her truck, Martha also did so in her car. Maria saw Martha's brake light go on and the passenger door open. Someone leaned inside Martha's passenger compartment where Alvin was sitting. When the person "raised out of the car," Maria saw it was Horace. Maria followed Martha as she drove to the pay phone. At trial, Maria identified the suit worn by the man who had jabbed his cane toward Alvin.

Gabriel Robinson, one of the other party guests, testified that many of the male guests wore suits and hats and carried canes. Robin-

son met defendant, who was Jerand's son-in-law, but did not spend much time with him. Robinson also identified the blue suit that defendant wore that night. According to Robinson, defendant carried "some type of dark cane or something." Robinson was not outside to witness the fight.

Illinois State Police Officer Walter Valentine testified that he attended the party, and he identified the suit defendant had worn. Valentine described defendant's cane as light-colored, almost pearl-like, with an animal head. Valentine left the party before the fight.

The manager of a dry cleaner store testified that someone dropped off a man's suit, vest, and shirt at his store. The manager gave the clothing and order form to the police. Officer Marc Welsh testified that his search of defendant's home disclosed a matching customer copy of the dry cleaner's form. Welsh also found a white hat, a pair of men's white shoes, and a cane in a coat closet. It is unclear from the transcript whether the cane had a metal blade at the end. The court admitted the items.

Officer Jason Plumb, Officer Jimmy Vandiver, Detective Paul Triolo, and a sergeant conducted independent searches of the crime scene from 3:30 a.m. to 9:20 a.m. on the morning following the incident. The police testified that they found nothing of evidentiary value.

Officer Douglas Penn described the circumstances of defendant's arrest. Defendant was stopped for a traffic violation around 6:45 p.m. on the day after the incident. Defendant cooperated with the arrest and consented to a search of the car. The search disclosed nothing.

Officer James Bowman testified that he and Officer Gene Koelker searched Martha's car for blood and fingerprint evidence in the impoundment garage on November 10, 2004. Bowman found blood on the right front passenger door, but it was not tested. A forensic scientist testified that blood was not found on the blue suit that was admitted into evidence.

Defendant called several police officers to testify in his defense. Defendant states that most of the testimony was for impeachment purposes, but he does not otherwise describe the testimony in his statement of facts. We infer from defendant's omission that he does not seriously challenge the credibility of the State's witnesses and views the impeachment evidence as inconsequential.

The defense objected to the State's jury instructions, but the trial court used them to instruct the jury. The jury found defendant guilty of first-degree murder. Defendant filed a motion for a new trial, and the court denied it on August 14, 2007. The court imposed a 30-year prison term, and defendant filed a notice of appeal on the same day.

## ANALYSIS

On appeal defendant argues that (1) the evidence was insufficient to support the conviction; (2) the trial court erroneously excluded evidence that Horace told Alvin "I'll kill you right now" at or around the time of the fatal stabbing; and (3) the charging instrument and the jury instructions on first-degree murder misstated the law. We reject each of defendant's contentions.

### A. Sufficiency of the Evidence

Defendant argues that the State failed to prove him guilty beyond a reasonable doubt and, therefore, he is entitled to a reversal of his conviction. When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, a reviewing court does not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "When reviewing the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Bishop*, 218 Ill. 2d 232, 249 (2006), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

Our duty is to carefully examine the evidence while giving due consideration to the fact that the court and jury saw and heard the witnesses. The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict. *Smith*, 185 Ill. 2d at 541. The credibility of a witness is within the province of the trier of fact, and the finding of the jury on such matters is entitled to great weight, but the jury's determination is not conclusive. We will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Smith*, 185 Ill. 2d at 542.

Defendant was convicted of first-degree murder, which occurs when a person, in performing the acts that cause another's death, "knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9—1(a)(2) (West 2006). Defendant's only challenge to the sufficiency of the evidence is whether he was correctly identified as the offender.

The State's theory is that defendant used his cane with the metal blade to stab the victim twice while he was on the ground getting

beaten by the angry crowd. One defense theory is that, while on the ground, the victim was stabbed by any of several attackers other than defendant. Defendant's alternative theory is that, after the victim rose from the ground and fled to Martha's car, Horace opened the passenger-side door, leaned in, and stabbed the victim before Martha could drive away.

Maria testified that she observed the fight from 12 to 15 feet away. She saw a man in a blue suit, later identified by multiple witnesses as defendant, standing over the victim while he was on his hands and knees. Maria saw defendant hold a four-foot blue cane with a three- or four-inch blade. Maria saw defendant hold the cane like a pool cue and jab it toward the victim's left side twice. Maria's observations were corroborated by the forensic pathologist, who testified that the victim had two stab wounds on his left side.

Defendant asserts that the State's evidence was deficient because Maria did not testify that she saw the blade make contact with the victim's body or saw blood spurt from the victim. Defendant suggests that "[a]nyone else in the crowd of attackers could have pulled a knife and stabbed Alvin while Maria was getting her truck and trying to position herself so that she could aid his escape." While direct evidence of defendant's blade piercing the victim's skin would further prove defendant's identity as the offender, such evidence was not necessary to sustain the conviction. The jury was free to make the reasonable inference that defendant killed the victim with the blade in his cane.

There was no evidence that any other weapon was drawn against the victim; thus, defendant's suggestion that Horace or someone else committed the offense is not supported by the evidence. Defendant's theory is further refuted by Martha's testimony that, when Horace leaned into her car, he merely punched the victim and was not holding a weapon or anything else. The victim did not look toward Horace but sat with his arms against his sides, which suggests that the victim was suffering from a stab wound that had already been inflicted.

Defendant also emphasizes that Maria's description of the blade as three to four inches long was inconsistent with the forensic pathologist's testimony that the fatal wound was seven inches deep. However, the pathologist testified that he could not determine the length of the blade used to inflict the fatal injury. Thus, it is possible that a three- to four-inch blade could have been thrust into the defendant's side with such force as to cause the seven-inch-deep wound. Furthermore, it is quite possible that Maria, who watched defendant brandish his cane 12 to 15 feet away, underestimated the length of the blade. These factual questions are within the province of the jury. In returning the guilty verdict, the jury implicitly found Maria's estimation of the

length of defendant's blade to be consistent with the injury, and we do not view that conclusion to be so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt.

Defendant further argues that the absence of blood at the crime scene, on his blue suit, and inside his car shows he did not stab the victim. On the contrary, defendant argues, the blood found on the door in the front passenger area of Martha's car shows that Horace stabbed the victim as he sat in the passenger seat. However, the surgeon who treated the victim testified that most of the blood from the wound pooled in the victim's abdominal cavity, which explains the absence of blood on the street. Also, the lack of blood on defendant's clothing can be explained by the length of the cane with which defendant stabbed the victim. The presence of the blood in Martha's car is consistent with the stabbing occurring either before or after the victim entered the car. From Maria's eyewitness testimony, the jury made the reasonable inferences that the stabbing occurred before the victim entered the car and that defendant was the offender, and we defer to the jury's conclusion.

Defendant emphasizes that Maria was the only person to testify that defendant jabbed a cane with a blade toward Alvin's left side. Defendant argues that Maria's testimony was insufficient to sustain the conviction, because there was no additional evidence that Maria "saw the defendant inflict Alvin's fatal stab wound or that she was in a position to know that no one else involved in the melee could have stabbed Alvin, instead." Defendant cites *People v. Lewis*, 365 Ill. 557 (1937), for the proposition that defendant's conviction must be reversed because the State failed to prove beyond a reasonable doubt that no one but defendant could have possibly inflicted the fatal wound.

■ Defendant essentially contends that a conviction cannot stand without eyewitness testimony or some other direct evidence of the fatal blow, itself. Defendant misinterprets the law. "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). In this case, defendant was present, he held the only weapon drawn against the victim, and he jabbed that weapon toward the part of the victim's body that suffered the fatal injury. From this circumstantial evidence, the jury made the reasonable inference that defendant stabbed the victim. We reject defendant's position that the reasonable inferences to be drawn from the evidence undermine the State's theory that defendant committed the offense.

Defendant argues that his conviction must be reversed because Martha "never indicated that she saw the defendant do anything to

Alvin." However, the conviction did not require testimony that Martha saw defendant stab the victim, because Maria's testimony was positive and the jury found her to be credible. See *Smith*, 185 Ill. 2d at 541. "Examining the trial evidence in the light most favorable to the State, we believe a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jordan*, 218 Ill. 2d 255, 270 (2006).

## B. Admissibility of Horace's Threat

■ Defendant argues that, if he is not entitled to an outright reversal of his conviction, we should grant him a new trial because the trial court erroneously barred the defense from calling witnesses to testify that Horace threatened to kill the victim at or around the time of the fatal stabbing. At the hearing, defendant did not make a formal offer of proof as to the content of the testimony. However, the prosecutor did not dispute defense counsel's assertion that certain police reports and written statements from occurrence witnesses included statements that Horace told the victim something like "I will kill you right now." Denise Lambert told the police that she heard such a statement. Also, Martha gave a written statement that, at the time Alvin argued with the doorman, "Horace walked up and calmly told Alvin to leave or he would kill him." According to Martha's statement, several people ran from the club toward them immediately after Horace's threat.

The State argues that the trial court correctly excluded the testimony as inadmissible hearsay, considering that Horace was a codefendant who would invoke his fifth amendment privilege against self-incrimination and therefore would be unavailable to testify. Defendant responds that the statement was admissible because (1) it was not hearsay or (2) it showed Horace's intent under the state-of-mind exception to the hearsay rule.

Defendant argues that the court's decision is subject to *de novo* review, and the State argues that it should be reversed only for an abuse of discretion. We agree with the State. Defendant cites *People v. Munoz*, 348 Ill. App. 3d 423 (2004), for the proposition that the exclusion is subject to *de novo* review because either (1) the court reached its decision without assessing the credibility of witnesses or (2) the court's exercise of discretion " ' "has been frustrated by an erroneous rule of law." ' " *Munoz*, 348 Ill. App. 3d at 438-39, quoting *People v. Caffey*, 205 Ill. 2d 52, 89 (2001), quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999). In *Munoz*, the trial court ruled that certain hearsay testimony was not admissible under the state-of-mind exception, based on the concept that "hearsay declarations relating to the contemplation of suicide are generally inadmissible, unless they are part of the

'*res gestae*,' a contemporaneous act of the decedent that such statements might characterize or explain." *Munoz*, 348 Ill. App. 3d at 434. On appeal, the *Munoz* court determined that the appellate court had "long held that a person's state of mind 'may be proved by testimony of contemporaneous oral declarations,' and expressly rejected the requirement that the declarations be accompanied by a contemporaneous related act." *Munoz*, 348 Ill. App. 3d at 436, quoting *Quick v. Michigan Millers Mutual Insurance Co.*, 112 Ill. App. 2d 314, 320 (1969). The *Munoz* court found *de novo* review of the exclusion to be appropriate because "the trial court based its ruling on relevant documents which it considered in conjunction with the parties' arguments and did not assess the credibility of witnesses. In addition, the trial court based its ruling on an erroneous rule of law." *Munoz*, 348 Ill. App. 3d at 438-39.

*Munoz* is factually distinguishable from this case, where there is no evidence that the trial court employed the wrong legal principle for determining the admissibility of Horace's statement. At issue here is not whether the trial court selected the correct law, but whether the court's application of the applicable law to the facts was erroneous. We acknowledge that the trial court considered written witness statements and police reports and did not hear a formal offer of proof at the hearing; but determining the admissibility of Horace's statement required the trial court to consider all the surrounding facts of the incident, including the credibility of the witnesses who would testify to the threat. Our supreme court has held that the abuse-of-discretion standard of review applies in this circumstance. In *Caffey*, the court stated that "[t]he decision whether to admit evidence cannot be made in isolation. The trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice. [Citation.] In this case, the trial court exercised discretion in making these evidentiary rulings, *i.e.*, the court based these rulings on the specific circumstances of this case and not on a broadly applicable rule." *Caffey*, 205 Ill. 2d at 89-90. Consistent with *Caffey*, we reject defendant's argument that the exclusion of Horace's threat is subject to *de novo* review.

The State correctly cites the well-settled principle that evidentiary rulings, such as granting a motion *in limine*, are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007). An abuse of discretion will be found only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable man would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). The controlling principles governing the admis-

sibility of evidence are also well settled. The court must ask whether the proferred evidence fairly tends to prove or disprove the offense charged and whether that evidence is relevant in that it tends to make the question of guilt more or less probable. *Wheeler*, 226 Ill. 2d at 132. "It is entirely within the discretion of the trial court to 'reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature.' " *Wheeler*, 226 Ill. 2d at 132, quoting *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). Mindful of these evidentiary principles and our deferential standard of review, we conclude that the trial court did not abuse its discretion in ruling that Horace's threat was hearsay and that defendant did not establish its admissibility under the state-of-mind exception.

### 1. Hearsay

"Hearsay is defined as 'testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter.' " *People v. Evans*, 373 Ill. App. 3d 948, 964 (2007), quoting *People v. Rogers*, 81 Ill. 2d 571, 577 (1980). Hearsay evidence is generally inadmissible because there is no opportunity to cross-examine the declarant. *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004). However, a statement offered for some reason other than for the truth of the matter asserted is generally admissible because it is not hearsay. *Evans*, 373 Ill. App. 3d at 964. For instance, if a statement is offered to prove its effect on the listener's state of mind, or to show why the listener acted as he did, the statement is not hearsay. *Evans*, 373 Ill. App. 3d at 964.

Defendant argues that Horace's threat was not hearsay, because it was not offered to show the truth of the matter asserted: that Horace killed the victim. Instead, defendant asserts that he "wanted to use the statement to prove simply that [Horace] had expressed his intention or desire to kill Alvin shortly before Alvin was killed and as part of the same incident that resulted in Alvin's death." However, the Appellate Court, First District, has held broadly that "threats against a victim of a crime made by a person other than the defendant are inadmissible hearsay." *People v. Gray*, 215 Ill. App. 3d 1039, 1051 (1991), citing *People v. King*, 276 Ill. 138, 153 (1916); M. Graham, Cleary & Graham's Handbook on Illinois Evidence §803.5, at 635 (5th ed. 1990). In agreement with *Gray*, we hold that Horace's threat against the victim was hearsay.

We agree with the trial court that defendant's heavy reliance upon *People v. Sanchez*, 189 Ill. App. 3d 1011 (1989), is misplaced. In *Sanchez*, the defendant and a coconspirator were charged with at-

tempting to murder a guard during a physical struggle involving all three men and a knife. The coconspirator allegedly said " '[w]e are going to kill you now,' " after which the defendant continued to hold the guard and fight with him. *Sanchez*, 189 Ill. App. 3d at 1015. The appellate court ruled that the statement was probative on the issue of whether the defendant knowingly aided his coconspirator's efforts to kill the guard. *Sanchez*, 189 Ill. App. 3d at 1015. The coconspirator's threat was not hearsay, because it was offered to prove its effect on the listener's state of mind and to show why the listener acted as he did.

In this case, there was no evidence that defendant and Horace conspired to kill Alvin or that defendant was affected by Horace's statement in any way. Furthermore, the trial court noted that Horace's statement would actually prejudice the defense because it would open the door to a prosecution theory of accountability: if Horace killed Alvin and defendant aided the attack based on Horace's statement, defendant would be guilty as an accomplice.

## 2. State-of-Mind Exception

At first blush, *Gray* appears to announce a bright-line rule excluding third-party threats against victims. However, the *Gray* court did not consider whether such threats are admissible under one of the exceptions to the rule barring hearsay, and defendant raises that possibility here. Defendant argues that, if Horace's threat was hearsay, it was nevertheless admissible under the state-of-mind exception to the hearsay rule.

Hearsay evidence is generally inadmissible unless it falls within an exception. *People v. Lawler*, 142 Ill. 2d 548, 557 (1991). Our supreme court has held that a hearsay statement may be admissible if it expresses the declarant's state of mind at the time of the utterance, such as his intent, plan, motive, or design. *Lawler*, 142 Ill. 2d at 559. "Statements that indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when [(1)] the declarant is unavailable to testify, [(2)] there is a reasonable probability that the proffered hearsay statements are truthful, and [(3)] the statements are relevant to a material issue in the case." *Caffey*, 205 Ill. 2d at 91.

As to the exception, defendant limits his argument to whether Horace's state of mind, at the time of his threat, is relevant to a material issue in the case. Defendant argues that the threat is "strongly probative of a central question of fact presented at trial: whether Alvin was fatally wounded due to an act committed by the defendant or by someone else." In response, the State meekly asserts that any trial error was harmless.

Our supreme court has long held that "[a]n accused in a criminal case may offer evidence tending to show that someone else committed the charged offense." *People v. Beaman*, 229 Ill. 2d 56, 75 (2008). However, we are aware of no Illinois authority that specifically addresses whether a third party's threat against the victim is admissible in a criminal prosecution to establish that the third party committed the offense. The authority of which we are aware that is most on point was set forth by the Connecticut Supreme Court several decades ago. The court stated, " '[a] declaration indicating a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible to prove that the act was in fact performed. It is admissible, not as a part of the *res gestae*, but as a fact relevant to a fact in issue.' This is in accordance with the more modern and better reasoned doctrine." *State v. Perelli*, 125 Conn. 321, 325, 5 A.2d 705, 707 (1939) (quoting *State v. Journey*, 115 Conn. 344, 351, 161 A. 515, 517 (1932), and citing M. Dansfield, Annot., *Admissability of Statements Made by Deceased With Reference to Purpose or Destination of a Journey or Trip He Was About to Make*, 113 A.L.R. 268, 288 (1938), and 3 J. Wigmore, Evidence §1725 (2d ed. 1923)). But see *People v. Cole*, 29 Ill. App. 3d 369, 374 (1975) (rejecting *Perelli*, "We find no basis for establishing in a criminal case 'the declaration of mental state' or 'a statement of intention' as an exception to the hearsay rule in derogation of the defendant's rights of confrontation and cross-examination as assured by the constitution"), abrogated by *People v. Grabbe*, 148 Ill. App. 3d 678, 688 (1986).

Paraphrasing *Perelli*, one could argue that Horace's declaration indicating his present intent to kill Alvin in the immediate future was admissible as relevant to defendant's guilt by proving that Horace actually killed Alvin. Horace's state of mind would be relevant to a material issue because arguably it tends to prove that defendant did not commit the offense and makes defendant's guilt less probable. See *Wheeler*, 226 Ill. 2d at 132.

However, the rule announced in *Perelli* provides that the statement's admissibility depends on certain indicia of reliability: the statement must be " 'made in apparent good faith and not for self-serving purposes.' " *Perelli*, 125 Conn. at 325, 5 A.2d at 707, quoting *Journey*, 115 Conn. at 351, 161 A. at 517 (and citing 113 A.L.R. at 288, and 3 J. Wigmore, Evidence §1725 (2d ed. 1923)). Defendant has not asserted that Horace's statement was made in apparent good faith and not for self-serving purposes, and defendant's omission supports the conclusion that the trial court did not abuse its discretion in determining that the hearsay statement was inadmissible.

Furthermore, a statement indicating the declarant's state of mind is admissible only if (1) the declarant is unavailable to testify, (2) there is a reasonable probability that the proffered hearsay statements are truthful, and (3) the statements are relevant to a material issue in the case. *Caffey*, 205 Ill. 2d at 91. The transcript of the hearing on the motion *in limine* shows that Horace's attorney appeared and declared that Horace would not testify. Defendant presumes that counsel's statement proves Horace's unavailability. However, as mentioned in the context of *Perelli*, defendant neither argued nor presented evidence that there was a reasonable probability that Horace's statement was truthful.

Even if the trial court abused its discretion in determining that Horace's statement was not relevant to the material issue of defendant's guilt, we may nevertheless affirm the exclusion on any basis supported by the record. Considering that defendant has failed to address the probability-of-truthfulness prong of the admissibility test for a state-of-mind declaration, we cannot conclude that the exclusion of Horace's threat is arbitrary, fanciful, or unreasonable or that no reasonable man would take the view adopted by the trial court. See *Illgen*, 145 Ill. 2d at 364.

### C. Jury Instructions

■ As discussed, the jury convicted defendant of first-degree murder under section 9—1(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/9—1(a)(2) (West 2006)). According to section 9—1(a)(2), "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death *** he *knows* that such acts create a *strong probability of death or great bodily harm* to that individual or another." (Emphases added.) 720 ILCS 5/9—1(a)(2) (West 2006).

The requisite mental state for knowing murder under section 9—1(a)(2) is knowledge " 'that such acts create a strong probability of death or great bodily harm to that individual' " (*People v. Smith*, 372 Ill. App. 3d 762, 768 (2007), quoting 720 ILCS 5/9—1(a)(2) (West 2004)), but the charging instrument and the jury instructions omitted the term "death" from this phrase. Defendant was charged with the knowledge that his acts created a strong probability of great bodily harm, but not death.

In his opening brief, defendant argued that he is entitled to a new trial because the indictment and the jury instructions deviate from section 9—1(a)(2). Specifically, defendant argued that his conviction must be vacated because it was "obtained under an indictment that charged him with having performed acts that caused Alvin Thomas'

death while knowing the acts created a strong probability of great bodily harm—but not of death—to Thomas." Defendant argued that he was prejudiced by this error because the charging instrument's omission of the term "death" did not apprise defense counsel of the correct elements of the offense with sufficient specificity to allow him to prepare a defense. See *People v. Rowell*, 229 Ill. 2d 82, 93 (2008) (when the defendant attacks the indictment or information for the first time after the trial, he must show that he was prejudiced in the preparation of his defense).

In his reply brief, defendant shifts his focus from the indictment to just the jury instructions. He concedes that whether he was prejudiced by the indictment "is not the issue." Defendant asserts, "[t]he question here is whether the findings of fact made by the jury pursuant to the definition and issues instructions that they received from the court were sufficient to support the conviction."

The purpose of jury instructions is to provide the jurors with the legal principles that apply to the evidence so they can reach a correct verdict. *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). "Jury instructions should not be misleading or confusing." *People v. Pinkney*, 322 Ill. App. 3d 707, 717 (2000). "[T]here must be sufficient evidence in the record to support an instruction, lest the jury be confused by issues improperly before it." *Pinkney*, 322 Ill. App. 3d at 717.

Supreme Court Rule 451(a) provides that, whenever the Illinois Pattern Jury Instructions (IPI) contain an applicable jury instruction, and after giving due consideration to the facts and law the court determines that the jury should be instructed on the subject, "the [pattern instruction] shall be used[ ] unless the court determines that it does not accurately state the law." 210 Ill. 2d R. 451(a). Where there is no pattern jury instruction on a subject on which the court determines the jury should be instructed, the court has the discretion to give a nonpattern instruction. *People v. Ramey*, 151 Ill. 2d 498, 536 (1992). A trial court's decision to use a nonpattern instruction should not be disturbed absent an abuse of that discretion. *People v. Pollock*, 202 Ill. 2d 189, 211 (2002). Whether the court has abused its discretion in giving a particular instruction depends on whether the instruction was an accurate, simple, brief, impartial, and nonargumentative statement of the applicable law. 210 Ill. 2d R. 451(a); *Pollock*, 202 Ill. 2d at 211.

The definition and issues instructions for first-degree murder contained in Illinois Pattern Jury Instructions, Criminal, Nos. 7.01 and 7.02 mirror section 9—1(a)(2) of the Code. See Illinois Pattern Jury Instructions, Criminal, Nos. 7.01, 7.02 (4th ed. 2000) (hereinafter IPI Criminal 4th). The trial court should have used the applicable pat-

tern instructions because they state the law accurately. We do not endorse the trial court's decision, but we conclude that in this case the use of instructions that deviated from the pattern instructions was not an abuse of discretion sufficient to warrant a reversal. We emphasize that the better course would have been to use IPI Criminal 4th Nos. 7.01 and 7.02, and we encourage the trial court to do so in the future.

In arguing for a new trial, defendant relies upon *People v. Morgan*, 197 Ill. 2d 404 (2001). In *Morgan*, the defendant shot his grandfather during a confrontation and shot his grandmother in the back as she was fleeing her home. He was charged with and subsequently convicted of, among other things, felony murder predicated on both aggravated battery and aggravated discharge of a firearm. Our supreme court held, "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Morgan*, 197 Ill. 2d at 447. According to the court, the predicate offense must involve conduct with a felonious purpose other than the killing itself. *Morgan*, 197 Ill. 2d at 458.

The offense of felony murder is defined as follows: "[a] person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause death *** he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9—1(a)(3) (West 2006). The Code defines "forcible felony" to encompass several enumerated felonies, including "aggravated battery resulting in great bodily harm or permanent disability or disfigurement." 720 ILCS 5/2—8, 12—4(a) (West 2006).

"The lack of an intent to kill for felony murder distinguishes it from the other forms of first degree murder, which require the State to prove either an intentional killing (720 ILCS 5/9—1(a)(1) (West 2002)) or a knowing killing (720 ILCS 5/9—1(a)(2) (West 2002))." *People v. Davis*, 213 Ill. 2d 459, 471 (2004). Our supreme court has expressed a concern that, in first-degree murder cases, the State might try to eliminate second-degree murder as a lesser offense and avoid the burden of proving an intentional or knowing killing by charging felony murder, because certain predicate felonies tend to accompany all murders. *Davis*, 213 Ill. 2d at 471, citing *Morgan*, 197 Ill. 2d at 447; *People v. Pelt*, 207 Ill. 2d 434, 441 (2003).

The problem is particularly prevalent in cases where the same evidence is used to prove the underlying felony as to prove the killing. *Davis*, 213 Ill. 2d at 471; *Pelt*, 207 Ill. 2d 434 (predicate felony of aggravated battery of a child arose from the throwing of an infant that caused the killing); *Morgan*, 197 Ill. 2d 404 (predicate felonies of aggravated battery and aggravated discharge arose from the shooting

that caused the killing). In such cases, the predicate felony underlying the charge of felony murder does not involve a felonious purpose other than the killing of the victim. *Davis*, 213 Ill. 2d at 471, citing *Pelt*, 207 Ill. 2d at 442.

Thus, where the evidence of the predicate felony and the killing is the same, the felony-murder statute might absolve the State of its duty to prove that the defendant possessed either an intent to kill or do great bodily harm or knowledge of a strong probability of death or great bodily harm, thereby allowing the State to "take a shortcut to a murder conviction." *Davis*, 213 Ill. 2d at 471-72.

To address this problem, *Morgan* held that, where " 'the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder.' " *Davis*, 213 Ill. 2d at 472, quoting *Morgan*, 197 Ill. 2d at 447; see also *Pelt*, 207 Ill. 2d at 441. *Morgan* ensures that, where the evidence of the predicate felony and the killing is the same, the prosecution must prove an intentional or knowing killing before punishing the defendant like a murderer. *Davis*, 213 Ill. 2d at 472; *Pelt*, 207 Ill. 2d at 442.

This case does not raise the same concerns confronted in *Morgan* and similar cases. Here, the State proceeded on a single count of first-degree murder under section 9—1(a)(2), rather than on a felony-murder charge predicated on aggravated battery. Section 9—1(a)(2) required the State to prove a knowing killing, and the jury was instructed to decide whether defendant performed the acts resulting in death knowing they created a strong probability of great bodily harm. See *Davis*, 213 Ill. 2d at 471-72. The first instruction stated, "[a] person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death, he *knows* that such acts create a strong probability of great bodily harm to that individual." (Emphasis added.) Similarly, the second instruction stated, "he *knew* that his acts created a strong probability of great bodily harm to Alvin Thomas." (Emphasis added.) Thus, the jury was instructed that defendant could not be convicted without a finding that he committed a knowing killing, and the State was not allowed to "take a shortcut to a murder conviction." See *Davis*, 213 Ill. 2d at 471-72. We hold that, under the circumstances, the trial court did not abuse its discretion in instructing the jury as it did.

Our decision is supported by *People v. Stalions*, 139 Ill. App. 3d 1033 (1986). There, the defendant was charged with, among other things, first-degree murder under section 9—1(a)(2). The requisite mental state for knowing murder under section 9—1(a)(2) is knowledge " 'that such acts create a strong probability of death or great bodily

harm' " (*Smith*, 372 Ill. App. 3d at 768, quoting 720 ILCS 5/9—1(a)(2) (West 2004)), but, rather than charging the mental state in a single count, the State parsed it into two counts. Count IV alleged that the defendant acted knowing his acts created a strong probability of death. Count V alleged that his actions created a strong probability of great bodily harm. *Stalions*, 139 Ill. App. 3d at 1034. The defendant was acquitted on count IV and convicted on count V (*Stalions*, 139 Ill. App. 3d at 1035), which was the functional equivalent of the outcome in this case. On appeal, the defendant argued that the verdicts were inconsistent, but the appellate court disagreed. Expressing its preference for a general verdict over separate ones, the appellate court stated, "[w]hile we believe the jury was probably overinstructed, we do not believe they were misinstructed." *Stalions*, 139 Ill. App. 3d at 1037. As in *Stalions*, the better course in this case would have been to use instructions charging defendant with the knowledge that his acts created a strong probability of death or great bodily harm, but the trial court's deviation from the pattern instructions was not reversible error. However, using the applicable pattern instructions would have obviated the need to address the issue on appeal.

For the preceding reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

O'MALLEY and JORGENSEN, JJ., concur.