# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Fultz*, 2012 IL App (2d) 101101

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES M. FULTZ, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-1101 |
| Filed | June 11, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for aggravated battery of a police officer, defendant's conviction was reversed and the cause was remanded for a new trial, since the evidence against defendant was not overwhelming, the trial was essentially a credibility contest between defendant and the officer, and due process and fundamental fairness required a new trial where defendant was erroneously barred from challenging the officer's credibility with the issue of bias and the trial court erred in giving, over defendant's objection, IPI Criminal 4th No. 3.13, concerning defendant's prior conviction, which had negative implications for defendant's credibility. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 09-CF-1096; the Hon. Timothy Q. Sheldon, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Thomas A. Lilien and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, for appellant. |
|---|---|
| | Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Victoria E. Jozef, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion. |
| | Justices McLaren and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, James M. Fultz, appeals his conviction of aggravated battery (720 ILCS 5/12-4(b)(18) (West 2008)). Defendant argues that the evidence was insufficient to prove his guilt beyond a reasonable doubt and that three errors cumulatively deprived him of a fair trial. For the following reasons, we reverse and remand.

¶ 2                                  I. BACKGROUND

¶ 3                                  A. Overview

¶ 4    This case arose out of two charges against defendant, each involving a different police officer. On June 10, 2009, two police officers, Jay Ellis and Douglas Rashkow, were on their bicycles when they observed Anthony Jackson, a person who was wanted on an outstanding warrant, outside at a backyard barbecue. When the officers tried to arrest Jackson, they encountered various objections from other persons, including defendant's mother, Beulah Fultz. Ellis and Rashkow called for backup, and additional officers arrived at the scene. When officers attempted to arrest Beulah, defendant apparently intervened.

¶ 5    That night, Rashkow signed a misdemeanor complaint charging defendant with obstructing a police officer for using his body to physically prevent Beulah's arrest. Almost eight weeks later, on July 31, 2009, a complaint was filed charging defendant with felony aggravated battery for knowingly making physical contact of an insulting and provoking nature when he allegedly "pushed" Officer Josh Horton in the chest. According to defendant, between the June 10, 2009, incident, and the July 31, 2009, complaint adding the charge of aggravated battery, Beulah filed a citizen's complaint against the Aurora police department. On October 7, 2009, defendant was charged by indictment with: (1) aggravated battery against Horton; and (2) obstructing a police officer against Rashkow. Defendant was convicted of both; however, this appeal pertains only to the aggravated battery count involving Horton.

## B. Pretrial

¶ 7 Prior to trial, defendant moved to exclude statements made at the scene by other persons (in which other persons yelled and called officers names) as being more prejudicial than probative. The court reserved ruling on the issue.

¶ 8 In addition, the State moved to admit, if defendant testified, evidence of prior felony convictions. Defense counsel argued that the court should consider that defendant's testimony would be important to show the difference between his and Horton's accounts. She noted that Horton did not request felony authorization for an aggravated battery until weeks later, and that other officers who wrote reports that day did not document that defendant touched Horton. The State responded that the decision-making process on a felony case is not admissible. The court determined that admission of one conviction would be appropriate, given that credibility between defendant and Horton would be at issue in light of their "polar opposite renditions of the facts."

## C. Trial

¶ 10 A jury trial commenced on April 5, 2010. In the State's opening statement, the assistant State's Attorney explained that the evidence would reflect that defendant pushed an officer to prevent his mother's arrest. In her opening statement, defense counsel stated that, although defendant was charged on the night of the incident with obstructing Rashkow, he was not charged with aggravated battery "until some 41 days later." At that time, the State objected and the attorneys approached the bench. Defense counsel explained that the fact that Horton did not immediately seek felony authorization "goes directly to his own interest." The court told defense counsel to make no further comment on the issue in her opening statement and that it would later address the issue at greater length. Counsel requested a ruling and the court sustained the State's objection.

¶ 11 Five witnesses testified at trial: (1) Ellis; (2) Rashkow; (3) Officer Ryan Feeney; (4) Horton; and (5) defendant.

### 1. Ellis, Rashkow, and Feeney

¶ 13 Ellis and Rashkow explained that they were on bicycle patrol when Ellis recognized Jackson eating at a backyard barbecue at Beulah's house. They dismounted their bicycles and Ellis called for Jackson to come over to them. Over defendant's objection, Ellis was permitted to testify that Jackson said "No, fuck that Ellis. I'm not coming over to you." The officers then went onto the property to make contact with Jackson.

¶ 14 There were 10 to 15 people attending the barbecue. Over a defense objection, Ellis testified that Beulah demanded that the officers "get off her property." Ellis explained that there was an outstanding warrant for Jackson. As Ellis approached Jackson, Jackson began walking up steps leading to a rear entry door to the house. The officers ran after him and stood on either side of him, and Ellis used his radio to confirm that Jackson was wanted on a warrant. Over defendant's objection, Ellis testified that Jackson said "Now don't you feel

stupid, I don't have a fucking warrant." Beulah, who had been in the yard, yelled that the officers should leave her property, that there was no warrant, and she attempted to step between Rashkow and Jackson near the door. She used her shoulder to push Rashkow out of the way, and Rashkow pushed her back and warned her that she would be arrested. Beulah took out her cell phone and said she was going to call a police lieutenant.

¶ 15    Ellis and Rashkow received confirmation that there was an outstanding warrant and handcuffed Jackson; various individuals, including (according to Ellis) defendant, approached and began "yelling and cursing" at the officers. According to Ellis, he and Rashkow detained Jackson on the porch until the arrival of both: (1) a van to transport Jackson from the scene; and (2) backup officers. When the van arrived, Ellis and Rashkow began walking Jackson to it. At that point, backup officers, including Feeney, Horton, and others, had arrived. Ellis took Jackson all the way to the van. Accordingly, he did not see defendant push Horton.

¶ 16    Rashkow similarly testified, over defense objection, that various people on the scene were "screaming and yelling" at the officers and that Beulah was yelling for them to get off of her property, that there was no warrant for Jackson, and that they were "harassing" Jackson. Beulah tried to "shoulder" her way past him, but he pushed her away and warned her to stay back. He told her she would be arrested. "She kept screaming and yelling at me." After backup officers, including Horton, arrived, Rashkow and Ellis moved Jackson from the porch to the van. However, Rashkow accompanied Ellis and Jackson only part way to the van, returning to the backyard where he had asked Horton to "keep an eye on Beulah because she was going to be taken into custody." Rashkow, Horton, and Feeney stood on the west side of the house, and Beulah was on the telephone. Rashkow began to approach Beulah and told her she was under arrest. She said she was not under arrest, "you are not going to arrest me," and she pushed past Rashkow and went toward the door. Rashkow warned her again, and decided to let other officers take Beulah into custody.

¶ 17    Horton "went first," and defendant approached the porch simultaneously. Rashkow saw Horton and Beulah "struggle," and so he approached. According to Rashkow, when he began to approach Beulah and Horton, who were about 15 feet away, defendant stepped in front of Rashkow; defendant positioned himself directly in front of Rashkow, about two feet away, declaring that Rashkow was not going to arrest his mother. Rashkow testified that, when defendant stepped in front of him, Horton was at the bottom of the steps and going onto the porch. Defendant stepped in front of him after the struggle between Horton and Beulah began and, apparently, in order to block Rashkow's path to join Horton on the porch. When asked where defendant was located when Rashkow saw Horton and Beulah struggling, Rashkow testified that defendant came toward Rashkow "from the area of the stairs." Rashkow testified that he never saw defendant have any contact with Horton.

¶ 18    Rashkow told defendant to move, but defendant did not comply. Rashkow tried to push defendant aside, and defendant put his hand out, with his palm facing Rashkow. He did not make contact with Rashkow. Rashkow drew his Taser gun, but did not use it, grabbed defendant by the shirt, and ordered defendant to the ground. Defendant did not comply and Rashkow told defendant he was under arrest. Once defendant was on the ground, Rashkow ordered him to roll over to be handcuffed. Defendant did not obey, so Rashkow and Feeney

-4-

rolled defendant over and handcuffed him. Rashkow agreed that defendant only passively resisted and never tried to strike the officers. Rashkow escorted defendant to the transport van.

¶ 19 Feeney's testimony was inconsistent with Rashkow's and Ellis's regarding his arrival and the events leading up to the arrests of Jackson and Beulah. Specifically, Feeney testified that he arrived at the scene *prior* to both Jackson's and Beulah's arrests. Feeney testified that he stood next to Rashkow. Feeney further testified that the people in the yard were yelling at the police. Feeney explained that he stood one foot to Rashkow's right side, and, when defendant intervened, defendant stood one foot in front of Rashkow. Finally, Feeney testified that, when defendant refused Rashkow's order to roll over, Feeney helped Rashkow handcuff defendant. However, he did *not* testify to seeing defendant push Horton.

¶ 20                                                    2. Horton

¶ 21 Before Horton took the stand, defense counsel asked the court to address the issue raised in her opening statement. Specifically, counsel requested permission to cross-examine Horton regarding the timing of the aggravated battery charge. Counsel explained that she wanted to ask Horton about the fact that it was not until July 21, 2009, that he called the State's Attorney's office to obtain felony authorization for the aggravated battery charge:

"I think it goes directly to his bias and interest. I don't intend on going into, as the State offered, their decisionmaking process about whether or not they authorized them or not, but only to the bias and interest of Officer Horton, and that he's going to testify, I expect, that [defendant] pushed him on June 10th and that he never went to get felony authorization for any charges.

He is aware of that procedure, that it is unusual that he doesn't get those right away and, Judge, I expect to ask him also that there was a citizen's complaint filed about the police action [on June 10, 2009], and that he was informed of that, which would also go to his bias and interest, and after 40 days, seeking charges of aggravated battery against [defendant]."

¶ 22 The State objected that Horton's decision-making process would create a trial within the trial, that it did not have anything to do with the merits of the allegations, and that the decision-making process within the State's Attorney's office, which the State would use to rebut defendant's line of questioning, would be inadmissible and "totally improper." The State argued that it thus would be unable to rebut the line of questioning. Further, the State argued that there could be many reasons why Horton delayed and, in any event, that *Beulah* filed the citizen's complaint (not in the record), not defendant, so "there would be no bias against the defendant." Finally, the State suggested that Horton's police report (not in the record) could be used to establish that he documented on the day of the incident that defendant pushed him.

¶ 23 Defense counsel reiterated that she did not intend to get into the State's Attorney's decision-making process. She argued that the delay went directly to Horton's bias and that "he can testify as to how long [he waited to] seek felony authorization. He can establish that foundation." Counsel argued that she expected that Horton would testify that he learned that

Beulah filed the complaint and then, 41 days after the incident, he sought the aggravated battery charge against her son. Counsel argued that the questioning went directly to Horton's bias and credibility. In sum, she argued:

"My questions would only go to, when was the first time that you sought felony authorization from the State's Attorney's Office, and wasn't that not until well over 40 days later and wasn't that only after you learned that [defendant's] mother had filed a complaint with the police department."

¶ 24 The court found defense counsel's proposed line of questioning irrelevant and immaterial, determined that the inquiry "doesn't go to prove anything whatsoever in the case; would open up a collateral issue, a trial within a trial," and denied counsel's request.

¶ 25 Horton testified that he arrived at the scene on June 10, 2009, in response to a dispatch call for assistance at Beulah's house. In contrast to the testimony of Ellis and Rashkow, Horton testified that, when he arrived, Ellis and Rashkow were already escorting Jackson in handcuffs toward Horton's squad car. Horton met them by the sidewalk. Horton approached them and Rashkow told him that Beulah was going to be arrested and that Horton should take her into custody. Horton knew Beulah and had had prior interactions with her. Horton went to the back of the property, where Beulah was standing near a small staircase by the back patio; he approached to take her into custody. At that time, Rashkow and Ellis were behind Horton. When Horton was a few feet away from Beulah, defendant "stepped between" Horton and Beulah and "put his hands on" Horton's chest, with both hands open and fingers spread, and said "you are not taking my mom." Defendant applied enough force to stop Horton's forward movement. Horton took defendant's hands, moved them away from his chest, and pushed defendant out of the way. Defendant stepped off to the side. Horton then proceeded to approach and arrest Beulah.

¶ 26 On cross-examination, Horton agreed that defendant stepped into his path with his hands outreached, Horton was walking forward, and defendant's hands stopped Horton's forward movement.

¶ 27                                3. Defendant's Testimony

¶ 28 The State rested. The court denied defendant's motion for a directed verdict. Defendant took the stand and testified that he was at the backyard barbecue with 10 to 15 people when Ellis and Rashkow arrived. Defendant kept quiet when they arrived and stood away from the officers while they arrested Jackson and took him to the transport van. Beulah was by the porch and yard; she was on a cordless telephone asking to speak to a shift commander. Beulah started to walk toward the house. Defendant then saw several officers walking at a fast pace behind her, so he "intervened with Rashkow and asked what was going on." Defendant testified that he did not hear anyone tell Beulah she was under arrest and that the officers were basically chasing her. When defendant stepped in front of Rashkow and asked what was going on, Rashkow pushed defendant with his left hand. Defendant said "What's going on?" Rashkow told him to back up and get out of the way. Defendant said that he was not doing anything, and Rashkow pulled out his Taser. Defendant raised his hands and said "I'm not being aggressive with you; what's going on, what's going on?" Rashkow told him

to get down and defendant asked, "for what, for what, I'm not doing nothing." Rashkow put the Taser to defendant's chest, and defendant submitted and went to the ground. Defendant was then handcuffed.

¶ 29 Defendant testified that, prior to stepping in front of Rashkow, defendant had not made any contact with other officers, had not encountered Horton, and did not step in front of Horton. When asked if he had *any* physical contact with Horton, defendant replied "None." He never put his hands on Horton's chest.

¶ 30                          4. Certified Conviction and Closing

¶ 31 The court permitted the State to read into evidence a certified conviction against defendant for unlawful possession of a controlled substance. In closing argument, the State argued that the jury should believe Horton over defendant for various reasons, including because defendant had been convicted of another offense and "that means that may weigh on his believability as a witness in this case. The defendant versus Officer Horton, ladies and gentlemen, when you look at these *instructions*, I think that it's easy to determine who is the more believable witness in this case." (Emphasis added.)

¶ 32                              D. Instructions and Verdict

¶ 33 At the instructions conference, the State offered Illinois Pattern Jury Instructions, Criminal, No. 3.13 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.13), which instructed that the jury could consider defendant's prior conviction only to assess his credibility, not as proof that he was guilty of the charged offenses. Defense counsel objected, stating "I'm going to object and ask that it not be given in this particular case. We do have the one conviction in. I think this would highlight it." The court overruled defendant's objection and gave the instruction. The jury found defendant guilty of both charges.

¶ 34                                      E. Posttrial

¶ 35 The court denied defendant's posttrial motion, but agreed that its decision to give, over defendant's objection, IPI Criminal 4th No. 3.13 was error because the committee comment to the instruction explains that it should be given "only at the request of the defendant." IPI Criminal 4th No. 3.13, Committee Note. Nevertheless, the court found the error to be harmless.

¶ 36 In addition, defendant argued posttrial that the court erred in prohibiting his line of inquiry regarding Horton's knowledge of Beulah's complaint against the police department about the events that occurred at her house on June 10, 2009, and Horton's subsequent request for felony authorization. The State represented that Beulah's complaint pertained only to Rashkow, and defense counsel objected that the complaint was not in evidence. The State then represented that Horton wrote a report about the incident and described defendant's actions in that report before defendant was charged and before the complaint by Beulah was made. Defense counsel objected that the report was not in evidence. The State replied that in discovery it provided defendant with a copy of Horton's report, which was

dated June 10, 2009, and, so, "it's not as though Officer Horton suddenly made up what [defendant] did and decided to request a charge." Further, the State questioned the basis of the alleged bias, questioning how Horton, by charging defendant, would be protecting another officer (*i.e.*, Rashkow) who was the subject of the complaint by someone other than defendant (*i.e.*, Beulah). The State concluded, "Officer Horton wrote a report at the time. Just didn't–our office or the police department didn't charge [defendant] with a felony at the time." The State represented that it did not know whether Horton sought, on the night of the incident, a felony charge. "But there's a whole process that we would have had a whole separate trial about, in order to determine just why Officer Horton just didn't charge the defendant that first night, as opposed to 30 days later. When, in fact, he wrote a report that night that indicated that the defendant had pushed him."

¶ 37    In rebuttal, defense counsel noted that police reports typically reflect when an officer sought felony authorization, who he or she spoke to, and whether that request was granted or denied. Here, however, no report reflects that Horton sought felony authorization. The State agreed that no report reflects whether Horton sought felony authorization. Defense counsel further noted, as to Beulah's complaint, that she was not permitted to get into the subject of the complaint, who it was against, and whether it involved Horton. She represented that the complaint was all about the incident that happened between defendant, Beulah, and the officers. Counsel reiterated that she should have been permitted to ask Horton about the fact that he had the discretion to seek charges that same day and yet he did not do so until 40 days later; she had no interest in the State's Attorney's office and its processes because, at the stage when Horton was deciding whether to seek charges, it was not involved.

¶ 38    The court denied the posttrial motion and sentenced defendant to three years' imprisonment. Defendant appeals.

¶ 39                                II. ANALYSIS

¶ 40                         A. Sufficiency of the Evidence

¶ 41    Defendant argues first that the evidence was insufficient to prove his guilt of aggravated battery. Specifically, he notes that: (1) despite the presence of several other officers, Horton was the only witness who testified that defendant made physical contact with him; (2) Horton's testimony was "significantly inconsistent" with the testimony of other officers; and (3) Horton's testimony failed to show that defendant made contact of an insulting or provoking nature. Therefore, he argues that we must reverse his conviction outright. For the following reasons, we disagree.

¶ 42    When a defendant challenges the sufficiency of the evidence supporting his or her conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). It is the function of the trier of fact to weigh and resolve conflicts in the evidence and draw reasonable inferences therefrom. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). Nevertheless, while the jury's findings regarding witness credibility are entitled to great weight, the jury's

determination is not conclusive. *People v. Smith*, 185 Ill. 2d 532, 542 (1999). The appellate court will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.*

¶ 43    Here, defendant argues that, although the indictment alleged that he contacted Horton in an insulting and provoking manner when he "pushed" Horton, the evidence did not establish beyond a reasonable doubt that defendant initiated any contact with Horton. Defendant notes that there were numerous guests and officers at the scene, yet the State called only four witnesses, including Horton, and *none* of the other witnesses saw any interaction between defendant and Horton. He notes that Rashkow and Feeney were, based on their testimony, in a position where they would have seen defendant's interaction with Horton if, in fact, it had occurred.

¶ 44    We agree with defendant that Rashkow's and Feeney's testimony was such that, if contact between Horton and defendant occurred, it is surprising that they did not see it. Rashkow and Feeney were watching Horton approach the porch to arrest Beulah and, *after* they saw Horton and Beulah engage in a struggle, they moved forward to assist. According to Rashkow, it was then that defendant stepped, from the stairs near the porch, between Rashkow and Horton.

¶ 45    However, and as defendant concedes, the testimony of a single credible witness, even if it is contradicted by the defendant, may be sufficient to sustain a conviction. *Smith*, 185 Ill. 2d at 541-42; see also *People v. Rendak*, 2011 IL App (1st) 082093, ¶ 31. Horton testified that, as he followed Beulah toward the porch, defendant stepped in front of him and put his hands out onto Horton's chest. Horton pushed defendant out of the way and continued toward Beulah. Rashkow and Feeney did not testify that they saw the contact, but Rashkow did testify that Horton and defendant approached the porch at the same time *and* that defendant came toward Rashkow "from the area of the stairs." Therefore, the jury could have reasonably found that Rashkow's description of defendant and Horton approaching the porch at the same time, coupled with Rashkow's additional testimony that defendant approached Rashkow from the stairs area, bolstered Horton's account. In essence, the jury could have considered Horton's testimony in addition to the foregoing two aspects of Rashkow's testimony and concluded that the contact with Horton occurred first, and that defendant stepped in front of Rashkow after Horton pushed defendant aside. The jury could have assumed that Rashkow did not see the contact because Horton's body blocked Rashkow's view.

¶ 46    Defendant disagrees that Horton falls into the category of a single *credible* witness, arguing that Horton's testimony was *not* credible. Not only was Horton's testimony uncorroborated, defendant argues, it was inconsistent in many respects with that of the other officers. Specifically, Horton's account of when he arrived differed from Feeney's and Rashkow's: Feeney testified that Horton was at the scene when Jackson was detained on the porch, and Rashkow stated that Horton arrived before he and Ellis took Jackson from the porch to the van. Horton, in contrast, testified that Jackson was already being escorted to the van when he arrived. Further, according to Horton, Rashkow told him to arrest Beulah, when, in contrast, Rashkow testified that he told Horton only to keep an eye on Beulah. Simply put, we reject this argument because it was for the jury to decide whom to credit, whether these

inconsistencies were significant, and whether they detracted from Horton's credibility.

¶ 47    Defendant asserts that it is critical for this court to consider the overall impact that the inconsistencies and lack of corroboration had on Horton's credibility as compared to defendant's. He asserts that, for purposes of assessing sufficiency, we should view the evidence *not* simply as a matter of Horton's word against defendant's but, rather, as Horton's credibility as compared to that of all the witnesses who either rejected (defendant) or could not support (all the other witnesses) Horton's story. The problem with defendant's argument is that it strips the entire record down to *only* the testimony about defendant's alleged physical contact with Horton without considering how the entirety of the record could have influenced the jury's deliberations. For example, the officers testified that, when they tried to arrest Jackson, the persons at the scene were upset. They explained that Beulah was yelling at them, pushing past them, and calling their supervisor. Defendant's testimony established that, when he noticed officers rapidly following Beulah, he had a physical encounter with Rashkow. And Rashkow testified that defendant approached the porch at the same time as Horton and then approached Rashkow *from* the direction of the porch. Again, the question is whether we can say that the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt; we cannot substitute our view of the evidence for the jury's. *Smith*, 185 Ill. 2d at 542. When the jury considered Horton's testimony in light of the evidence as a whole, it could have reasonably found beyond a reasonable doubt that defendant made contact with Horton.

¶ 48    Finally, defendant argues that, even if the evidence can be viewed to establish that he made contact with Horton, it did *not* establish beyond a reasonable doubt contact of an insulting or provoking nature. Specifically, defendant argues that, although the State alleged that he "pushed" Horton, Horton's testimony reflects only that Horton *walked into* defendant's outstretched hands. Further, defendant notes that Horton did not testify that he found the contact to be insulting or provoking; rather, he testified only that he moved defendant out of the way and kept walking.

¶ 49    Defendant is correct that, to prove him guilty of aggravated battery against Horton, the State had to prove, beyond a reasonable doubt, that he made physical contact of an insulting or provoking nature. See 720 ILCS 5/12-3(a)(2), 12-4(b)(18) (West 2008). However, we reject defendant's argument because, even if Horton did not explicitly testify that he felt insulted or provoked by defendant's contact, the trier of fact may take into account the context in which a defendant's contact occurred to determine whether the touching was insulting or provoking. *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55 ("[t]he victim does not have to testify he or she was provoked; the trier of fact can make that inference from the victim's reaction at the time"); *People v. DeRosario*, 397 Ill. App. 3d 332, 334 (2009) (contact can be insulting or provoking depending on the context, including the parties' relationship).

¶ 50    Here, defendant argues that the aggravated battery statute speaks of one who "makes" contact and that, here, Horton caused the contact and defendant was the object of the contact. Inherent in this argument is defendant's suggestion that he was just standing in place, with his hands and arms outstretched, and Horton walked right into him. However, the evidence reflected that, when he saw Horton approaching Beulah, defendant *stepped in front* of Horton

with his arms extended. The jury could have reasonably inferred that defendant stepped in front of Horton with outstretched hands intending to physically stop him. Thus, the jury could have reasonably inferred that, where defendant knew that Horton was an officer acting in the performance of his duties, and he *stepped in front* of Horton with his arms extended, the resulting contact, which was sufficient to stop Horton's forward movement, was a knowing insult or provocation. The jury could also have reasonably inferred that Horton was insulted and/or provoked where he reacted by pushing defendant aside.

¶ 51    In sum, we reject defendant's challenges to the sufficiency of the evidence.

## B. Cumulative Error

¶ 53    Defendant next argues that, cumulatively, the court's decisions to: (1) preclude the defense from presenting evidence bearing on Horton's credibility; (2) allow the State to introduce testimony concerning irrelevant and inflammatory statements made at the scene by Jackson and Beulah; and (3) give IPI Criminal 4th No. 3.13 over defendant's objection, prejudiced him and require a new trial. Defendant notes that two of the three alleged errors undermined his credibility, while the third deprived him of an opportunity to call Horton's credibility into question. Together, he argues, they rendered the verdict unreliable.

¶ 54    In instances where individual errors committed by a trial court do not merit reversal alone, the cumulative effect of the errors can deprive a defendant of a fair trial. *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003). In such cases, due process and fundamental fairness require that the defendant's conviction be reversed and the cause remanded for a new trial. *Id.* We address each claim of error in turn.

## 1. Horton's Credibility

¶ 56    Defendant argues first that the trial court erred in precluding his attempts to show that Horton complained of aggravated battery only after he became aware of Beulah's complaint against the police department. Defendant asserts that Horton's knowledge of Beulah's complaint gave him a motive to falsely accuse defendant, thereby affecting Horton's credibility. Defendant notes that he was constitutionally entitled to present evidence supporting his theory of the case and to confront and cross-examine his accusers, and that courts are to give a defendant the "widest latitude" (*People v. Blue*, 205 Ill. 2d 1, 14 (2001)) to elicit testimony showing that a prosecution witness has a motive to testify falsely. He argues that the subject of Beulah's complaint did not matter, because Horton could have been motivated to protect the department, to retaliate against Beulah by raising the stakes and charging her son, or to gain leverage for the department in any investigation into Beulah's complaint. Thus, he concludes, where Horton was the central witness for the State's case and where an inference that Horton had a motive to falsely testify against defendant could have been made, the court erred in denying defendant wide latitude in cross-examination. We agree.

¶ 57    The limitation of cross-examination rests within the sound discretion of the trial court and will not be reversed unless there has been a clear abuse of discretion. *People v. Green*, 339 Ill. App. 3d 443, 455 (2003). An abuse of discretion occurs only where the court's

decision is arbitrary or fanciful, or where no reasonable person would adopt the court's view. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1105 (2009).

¶ 58    The confrontation clause of the sixth amendment to the United States Constitution (U.S. Const., amend. VI) guarantees a defendant the right to cross-examine a witness against him or her for the purpose of establishing that the witness is biased or has a motive to testify falsely. *People v. Klepper*, 234 Ill. 2d 337, 355 (2009). However, trial judges retain "wide latitude to impose reasonable limits" on a defense counsel's inquiry into the potential bias of a witness, based on various concerns, including confusion of the issues or interrogation that is of little relevance. *Id.*

¶ 59    Here, the critical issue at trial was the credibility of Horton's testimony that defendant pushed him. Defense counsel thoroughly emphasized to the jury that no other witness corroborated Horton's depiction of the event and that defendant testified that the event did not happen. However, we do not agree with the State that such cross-examination was sufficient to challenge Horton's credibility on account of bias or motive to testify falsely. Specifically, there is a difference between challenging the credibility of a witness's account of events and challenging the overall credibility of the witness him or herself. There is a difference between pointing out inconsistencies or weaknesses in a story and exploring why or for what reasons the witness might fabricate the story. Here, the trial court did not impose "reasonable limits" on defendant's ability to explore the relevant issue of Horton's potential bias. Instead, rather than limit, the court entirely precluded any line of questioning regarding Horton's potential bias.

¶ 60    Nevertheless, the State argues, the court's decision was not an abuse of discretion. The State notes that the court considered the issue on three occasions, and further asserts that it was not fanciful for the court to decide that "the line of questioning concerning the timing of the aggravated battery complaint" was irrelevant and improper. However, defendant did not seek to question Horton about "the timing of the aggravated battery complaint." He was not seeking to explore the timing of the charging instruments themselves. Rather, defendant wished to question Horton regarding only *Horton's* decisions and actions. Indeed, while the premise of the court's ruling–that the questioning would open up a collateral issue and lead to a mini-trial regarding the processes in the police department and State's Attorney's office for pursuing felony charges–might be a basis for *limiting* the scope of the examination, we cannot find reasonable the court's decision to not allow any questioning of Horton regarding whether he: (1) was familiar with the procedure for seeking felony authorization; (2) sought felony authorization against defendant and, if so, when; and (3) when, if ever, he became aware of Beulah's complaint against the police department regarding the June 10, 2009, incident. Rather than addressing collateral issues of the timing of the charging instruments themselves, or matters beyond Horton's control, the foregoing topics were entirely within Horton's own knowledge regarding what he knew, when, and what, if any, actions he took.

¶ 61    Defendant requests us to consider this error only in a cumulative-error context. Indeed, we cannot find the error, on its own, reversible. Although a defendant should be allowed the " 'widest latitude possible' " on cross-examination to establish bias or a motive to testify falsely, the evidence of bias or motive must not be remote or uncertain and it must give rise to an inference that the witness has something to gain or lose by his or her testimony. *Green*,

339 Ill. App. 3d at 455 (quoting *People v. Furby*, 228 Ill. App. 3d 1, 3-5 (1992)). Here, as there was no offer of proof below regarding Horton's answers to the aforementioned questions, the contents of Horton's police report, or the contents and subjects of Beulah's complaint, we cannot assess whether defendant's questioning of Horton would have resulted only in remote or uncertain evidence of bias or motive. Indeed, both sides agree that it is currently unknown from the record whether Horton (as opposed to someone else in the department) ever requested felony authorization. If he did not, then, presumably, defendant's examination into Horton's bias would have quickly come to a halt. Thus, while we agree with defendant that the court abused its discretion where it did not allow any examination into whether Horton's testimony was retaliatory, we cannot reverse on this basis alone. Therefore, and as defendant requests, we will assess the error within a cumulative-error framework.

¶ 62                                                 2. Witness Comments

¶ 63       Defendant next argues that the court erred where it partially denied his motion *in limine* and allowed into evidence statements that Jackson and Beulah made at the scene. The specific comments defendant challenges are Jackson's comments: (1) "No, fuck that Ellis. I'm not coming over to you" and (2) "now, don't you feel stupid, I don't have a fucking warrant." Defendant further challenges the admission of Beulah's comments, wherein she: (1) "demanded" that Ellis and Rashkow "get off her property" and (2) was "yelling" for the officers to "get off her property" and that they were "harassing" Jackson. Defendant argues that the court erred because the statements were highly inflammatory and, at best, only marginally relevant. Defendant argues that the statements had little to no probative value, because they were not made by him. Thus, there was no reason to disclose them to the jury except to exploit their inflammatory nature and unfairly suggest that defendant was more likely to behave aggressively toward Horton because one of his guests and his own mother displayed hostility toward the police.

¶ 64       We review rulings concerning the admissibility of evidence for an abuse of discretion. *Dunmore*, 389 Ill. App. 3d at 1105. As noted, an abuse of discretion occurs only where the court's decision is arbitrary or fanciful, or where no reasonable person would adopt the court's view. *Id.*

¶ 65       Here, we cannot find that the court abused its discretion. The comments made by Jackson and Beulah provided context to the officers' decisions to call for police backup and to arrest Beulah, which, in turn, is what resulted in defendant's intervention. Further, the relatively comprehensive view of the number of people at the scene coupled with the heightened emotion provided a basis from which the jury could have found that, despite their positions, Rashkow and Feeney might have been too distracted by the entirety of the scene to notice Horton's brief physical encounter with defendant.

¶ 66       Defendant argues that the State's need to explain the officers' actions was simply not so necessary as to outweigh the comments' inflammatory nature. However, as defendant concedes, the court pretrial balanced the State's interests against defendant's by permitting the State to offer, with respect to *other* individuals at the scene (not Jackson or Beulah), only

the general nature of the comments without getting into their exact content. Defendant argues that the court should have made the same ruling with respect to the comments made by Jackson and Beulah, but the fact remains that, by considering each witness and the statements made and determining whether to allow the exact language or merely the generalized nature of the comments, the court clearly engaged in a thoughtful balancing analysis. We simply do not agree with defendant that the comments by Jackson and Beulah were more prejudicial than probative. To exclude the comments would have created an artificial semblance of a benign scene, contrary to the one that the officers faced. Indeed, if the jury had heard only that Beulah and Jackson made comments reflecting that they were upset or angry, Rashkow's ordering Beulah's arrest and, ultimately, pointing a Taser gun at defendant would have seemed less reasonable than when the full extent of the situation is revealed.

¶ 67                                    3. Jury Instruction Error

¶ 68        Defendant next argues that the court erred in giving over his objection IPI Criminal 4th No. 3.13 and that the error was not harmless. Defendant argues that, contrary to the State's assertion, the instruction does not necessarily benefit a defendant by limiting the purposes for which the jury may consider the prior conviction; rather, the instruction can also serve to highlight to the jury that the defendant has a prior conviction, and *that*, presumably, is the reason why the committee comments specify that the instruction may be given only at the defendant's request. Defendant argues that this case differs from those where a court's refusal to give a defendant's requested instruction is viewed as harmless, because, here, the court *gave* an instruction that defendant did not want given. Under the facts of this case, defendant argues, any error that could have made defendant seem less credible than Horton might well have affected the outcome.

¶ 69         Clearly, and as the trial court conceded and the State concedes now, IPI Criminal 4th No. 3.13 was given in error. Defense counsel objected to the instruction at the instructions conference and specifically noted that the basis of her objection was that it would highlight the conviction for the jury. The question, therefore, is whether the error was harmless. A court's refusal to give instructions in the manner proposed is harmless where the result of the trial would not have been different if the instructions had been given as proposed. *People v. Brandon*, 283 Ill. App. 3d 358, 364 (1996). Further, errors in instructions are generally deemed harmless where the instructions, taken as a whole, fully and correctly state the law. *Id.*

¶ 70        Here, the State argues that the instructional error was harmless because, as a whole, the instructions correctly stated the law and the error could have only benefited defendant. The State argues that, although defendant argues prejudice in that the instruction highlighted his conviction, the instruction was merely duplicative of the State's closing argument, which did the same. Thus, the State argues, the instruction merely benefitted defendant by blunting the impact of his properly admitted conviction.

¶ 71        We reject the State's arguments that the instruction serves only to benefit a defendant and that the error is harmless when the instructions, as a whole, are accurate. Both of these arguments, when applied to an earlier version of IPI Criminal No. 3.13 (no material change

-14-

in text), were effectively rejected by the appellate court. Specifically, in *People v. Gibson*, 133 Ill. App. 2d 722 (1971), the defendant raised several issues on appeal, but the court found that only two grounds for reversal were material, one of which was that the trial court erred in giving, at the State's request, IPI Criminal No. 3.13. The court noted that the instruction correctly set forth the law, but that it should be given *only* at the request of the defendant. *Id.* at 726. The court stated:

> "It should be the prerogative of the defendant to determine whether such an instruction is beneficial to his defense or whether it would only serve to accentuate his past criminal record. To use or to not use such an instruction is a matter which is to be determined by the defendant or the trial court on its own motion, and not by the People. The giving of such an instruction by the People was prejudicial to the defendant and constitutes error." *Id.*

We are mindful that the court did not reverse solely on this ground. However, of the issues the defendant raised on appeal, the court did find that the error required attention. Further, the court found critical that giving the instruction is the defendant's prerogative.

¶ 72    Another reversal, based, in part, on an improper use of IPI Criminal No. 3.13, occurred in *People v. Cook*, 262 Ill. App. 3d 1005, 1019 (1994). There, the court found that the trial court erred in giving IPI Criminal No. 3.13 at the State's request because "[g]iving this instruction at the behest of the State may unfairly accentuate defendant's past criminal record." *Id.* Although the court had found the evidence sufficient to sustain the defendant's conviction, the court *rejected* the State's argument that reversal was unwarranted because the evidence against the defendant was overwhelming. *Id.* at 1017, 1019.

¶ 73    The State points to a case where the instructional error did *not* mandate reversal. It notes that, in *Brandon*, the court held that, even though the instruction was given in error and the committee comment must be followed, the error was harmless. *Brandon*, 283 Ill. App. 3d at 364. As defendant notes, however, *Brandon* found the error harmless "in the unusual circumstances of [that] case." *Id.* Specifically, the instruction was deemed harmless in *Brandon* because a similar instruction was also provided for other witnesses (not the defendant), who had testified and had been impeached with prior convictions. Because the trial court gave a similar instruction regarding other witnesses and had instructed the jury to consider the defendant's testimony in the same manner as it judged other witnesses' testimony, the trial would not have had a different result if the instruction had not been given. *Id.* at 364-65. Here, in contrast, the trial witnesses consisted of police officers, none of whom were impeached with prior convictions, and defendant. Thus, unlike in *Brandon*, the erroneous instruction regarding prior convictions with respect to defendant was in no way insulated by similar instructions regarding other witnesses. Again, the *Brandon* court explicitly stated that the circumstances were unusual and that the committee comment to IPI Criminal No. 3.13 must be followed. As we do not, here, have circumstances similar to those in *Brandon*, we do not find the result in *Brandon* controlling.

¶ 74    We conclude that the court's instructional error here was not harmless. In so finding, we consider the circumstances of this case. The evidence here, while sufficient to sustain the conviction, was not overwhelming. Rather, the evidence exclusively concerned a credibility

contest between Horton and defendant. Given that defendant was not permitted to fully challenge Horton's credibility, the instructional error, coupled with the State's closing argument (in which the prosecutor relied on "the instructions" to remind the jury that, in assessing whether to believe Horton or defendant, it should remember that defendant has a prior conviction), was not harmless. We are guided by the decisions in *Gibson*, *Cook*, and *Brandon*, which make clear that, because the instruction, contrary to the State's argument, can indeed prejudice a defendant, the instruction may be given *only* at the defendant's request. Because this case came down to a credibility contest between Horton and defendant, and because the instruction concerned defendant's credibility and was erroneously given over his objection, we cannot conclude that the result of the trial would not have been different if the instruction had not been given.

¶ 75    We note that the State is correct that, even absent IPI Criminal 4th No. 3.13, it is allowed to emphasize the impact of a prior conviction in closing argument. However, as defendant notes, if we find harmless the court's giving of IPI Criminal 4th No. 3.13 *over a defendant's objection*, on the basis that the State can highlight the conviction in closing argument anyway, or because other instructions were legally accurate, we have rendered meaningless the instruction's requirement that the power to request or *reject* the instruction lies solely with the defendant.

¶ 76    In sum, we agree with defendant that the trial errors cumulatively deprived him of a fair trial. The trial came down to a credibility contest between Horton and defendant. The erroneous rulings went to the heart of that issue. Specifically, and as discussed above, defendant was erroneously precluded from challenging Horton's credibility with the issue of bias. Then, the instructional error had negative implications for defendant's credibility. Together, and under the facts of this case, the errors convince us that due process and fundamental fairness require that defendant's conviction be reversed and the cause remanded for a new trial. Thus, we reverse defendant's aggravated battery conviction and remand the cause for a new trial on that charge.

¶ 77                                    III. CONCLUSION

¶ 78    For the foregoing reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded.

¶ 79    Reversed and remanded.