2023 IL App (2d) 210658-U
No. 2-21-0658
Order filed February 15, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10-CF-3415 |
| TIRINO C. JACKSON, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Trial court did not abuse its discretion by allowing State to play recorded statement to refresh witnesses' recollections before the jury and substantial portions of recordings were admissible in accordance with the past-recollection-recorded exception to the hearsay rule; trial court did not abuse its discretion in allowing State to present evidence that defendant was wearing a bulletproof vest when arrested; and if any error occurred, it was harmless.

¶ 2                                    I. INTRODUCTION

¶ 3    Following a jury trial in the circuit court of Winnebago county, defendant, Tirino Jackson, was convicted of first-degree murder and being an armed habitual criminal.  He was sentenced to

consecutive terms of 75 and 20 years' imprisonment. He now appeals, and, for the reasons that follow, we affirm.

¶ 4                                   II. BACKGROUND

¶ 5     Defendant's convictions arise out of the shooting death of Terrence Shumate on February 21, 2010. The following evidence was adduced at trial.

¶ 6     The State first called Brenda Shumate, the victim's aunt, who raised him. The victim was known as "Bay Bay." On the day before he was killed, the victim left his house with "David and a guy named Stanley or Tank." On cross-examination, she stated that she had never seen defendant.

¶ 7     The State's next witness was Donald Todd, a former Rockford police officer. On February 21, 2010, at about 4:18 a.m., he was dispatched to the area of Harrison Avenue and Olsen Street for a welfare check. Another officer reported that he had not found anyone at that location. Todd turned west onto South Avenue, where he observed a body lying in the roadway. There appeared to be blood near the victim's head. He reported finding the body, and other officers and paramedics soon arrived. He approached the body and asked if the person was okay, but he received no response. Paramedics found no pulse. Todd secured the area.

¶ 8     Dr. Mark Peters, a forensic pathologist, was also called by the State. Peters testified that he performed an autopsy on the victim. Stippling indicated that the victim was shot at close range, "between 12 and 24 inches." He opined that the victim died as a result of a gunshot wound to the head. On cross-examination, he acknowledged that he did not recover the bullet that caused the victim's death.

¶ 9     Shawn Welsh, a detective with the Rockford Police Department next testified for the State. At the time of the events at issue here, he was a patrolman. On November 4, 2010, at about 1 a.m.,

Welsh participated in serving a murder warrant on defendant. Officers in plain clothes and unmarked cars watched a house they believed defendant was in. Defendant left in a white car, and they attempted to stop it. The white car fled. Welsh and two other patrol officers took over pursuit. A white female was driving the white car, and a black male was in the passenger seat. The car turned down an alley. It slowed down, and "the white female who was driving the car kind of tumbled out of the car and the passenger moved over and took control of the car." The police continued to pursue. The white car drove through residential neighborhoods, reaching speeds of up to 80 miles per hour. After about 10 minutes, the white car crashed into a fire hydrant and came to a stop. The defendant fled on foot. Defendant was apprehended a short time later.

¶ 10    Welsh identified a number of photographs of defendant taken at this time. Some depicted defendant wearing a bulletproof vest. Welsh testified that at the time he was arrested, defendant "was wearing blue jeans, the white under shirt, the bullet proof body armor over the white shirt and the red T-shirt over that."

¶ 11    On cross-examination, Welsh explained that he was in the third car in line pursuing defendant. By the time he pulled up to the crash site, defendant had already fled. Welsh remained in his car and drove to the east. He encountered defendant running on foot. Welsh, who was armed with an AR-15 rifle, ordered defendant to stop. Defendant complied. He was then taken into custody.

¶ 12    The State then called Brett Merriman. Merriman testified that he was on federal probation and appeared in response to a subpoena. He stated that he grew up with defendant and they were "[k]ind of" brothers. Defendant was a foster child that had been placed in Merriman's home. Merriman was arrested by the FBI in March 2010. Following that arrest, Merriman spoke with investigators on March 31, 2010, in the Tazewell County Jail. When asked whether what he told

the investigators was true and correct, Merriman replied: "What I remember. I don't remember much." Merriman acknowledged listening to an audio recording of the interview on the day he testified.

¶ 13    Merriman testified that on February 23, 2010, he stayed at a Marriott with Ashley Cooksey. Defendant came to the hotel room. Merriman stated that he did not recall why defendant came to see him. He did not recall defendant telling him that he was "high." Merriman acknowledged hearing this on the audio recording, but stated that he could not remember, because: "Too much has happened since then. Head trauma. It's a blur." The State then sought to play a portion of the audio recording. Defendant objected. The State asserted that Merriman should listen to the recording and either adopt it or reject it. The trial court ruled that the recording could be played for "demonstrative purposes," whether it be to refresh Merriman's recollection or to impeach him for lying about not remembering something he just listened to that day.

¶ 14    Merriman then acknowledged listening to the recording while being transported to court earlier that day. He recognized his voice on the tape. Merriman then testified that when defendant came to the Marriott, he told Merriman he was "high." Merriman explained that "high" meant that he was in some sort of trouble, which Merriman said was due to a shooting. He could not recall what defendant stated exactly. He agreed that he had stated that defendant had shot someone on the audio recording. The trial court then granted the State's request to play the recording, over defendant's objection. He was then asked if defendant told him when the shooting occurred. Merriman testified that while he stated when the offense occurred on the recording, he did not actually remember this. Another portion of the recording was then played. Merriman was asked if defendant told him the victim's name. Merriman stated that he did not recall, but whatever he

said on the recording was accurate. The recording was played again, and Merriman was asked if he now remembered the identity of the victim. The following colloquy took place:

"Q. Is your recollection now refreshed as to the person that Tirino Jackson admittedly shot?

A. No. I'm just saying what I heard. I don't remember.

Q. I'm sorry?

A. I'm just saying what I heard. I said on the tape—I don't remember any of that."

He then acknowledged that he said defendant shot "Big T" on the tape.

¶ 15 Merriman acknowledged that he was on federal parole at the time he testified. He had served eight and a half years for "possession with intent to distribute cocaine base crack." He was also charged with being a felon in possession of a weapon. He further acknowledged other offenses that he had previously been convicted of. Merriman testified that either he or defendant purchased the .40 caliber gun that was used to shoot the victim. Merriman stated he could not recall why defendant shot the victim, aside from it being something about money. The State inquired, "Would the tape refresh your recollection as to why he shot this person?" Merriman answered, "You can press play on the tape and I'm going to tell you what I said on the tape." The trial court then allowed the State to play a portion of the tape.

¶ 16 Finally, Merriman testified that he was cooperating with the State in accordance with a "proffer agreement" that required him to tell the truth.

¶ 17 On cross-examination, when asked whether he was testifying based on his recollections or from what he heard on the recording, Merriman stated "a little bit of both." He then added that, without the tape, he remembered "barely any" of the conversation he had with defendant at the

Marriott. Merriman stated that "a lot has happened since then," such as, "10 years in prison, head trauma, [and] fights over cooperating with the government."

¶ 18     The State's next witness was Yavonna Pittman. She testified that she dated defendant for a "few months" in 2010. Pittman answered negatively when asked if she remembered February 20 and 21 of 2010. She acknowledged knowing defendant at that time. She recalled going to a Road Ranger gas station either late on February 20 or early on February 21, 2010. She stated that she did not recall why she went there. She did, however, recall speaking with Rockford detectives on April 27, 2010. She agreed that she was honest when she spoke with them.

¶ 19     The State sought to play a recorded portion of Pittman's statement to refresh her recollection. Defendant objected, arguing that since the State was simply refreshing Pittman's recollection, it would be improper to publish the recording to the jury. The State countered that Pittman stated she was being honest and thus adopted the statement. Further, the State continued, "if we do [this] outside the presence of the jury, we would be here all day." The trial court asked the State to establish a more complete foundation for the recording.

¶ 20     The State then asked Pittman if she recalled speaking with Rockford detectives on or about April 1, 2010. She did. She signed and initialed a typewritten statement at that time. She did not recall telling them anything about defendant talking about the murder. Pittman replied affirmatively when asked whether her statement would refresh her recollection. After reviewing her statement, she stated that she recalled signing it, but she did not remember telling the officers about defendant talking about the murder. She reiterated that she was telling the truth when she made the statement. She agreed that her recollection had not been refreshed. The trial court, noting that Pittman acknowledged that she read the statement, initialed it, signed it, dated it, and

did not deny it was true, found that there was a sufficient foundation for its admission. Defendant reiterated his objection.

¶ 21    Pittman then read portions of the statement before the jury, including the following: "My ex-boyfriend, Tirino Jackson, who also goes by the name of C-bo told me he was the one who shot and killed the by [*sic*] in Orton Keyes" (Orton Keyes is an apartment complex). As to why defendant killed the victim, Pittman read, "Tirino said something about the other guy being a scapegoat."

¶ 22    Pittman further acknowledged giving a statement on April 27, 2010, that was video recorded. She agreed that she wanted to be truthful when she made the statement. Pittman stated she could not recall anything about a "plan" that was to take place on February 20 or February 21. The trial court then granted the State's request to play a portion of the video "for reasons previously stated" over defendant's continuing objection. The recording was played, and Pittman continued her testimony.

¶ 23    She stated that on the night of February 20 or early in the morning of February 21, defendant came to her house. She went to the Road Ranger gas station where she saw Stanley Turner (a.k.a., "Tank"), though she added that she was "guessing" at this point. She left the Road Ranger with someone in her car, though she did not know his name. She drove him to Orton Keyes. She could not recall exactly where she dropped off this person (the victim), and the recorded statement was played again (over defendant's objection). After the recording was played, Pittman testified that she dropped the person off on a deserted road, as directed by defendant. Her passenger got out, and she left. Pittman testified that she did not see defendant there, but then added that she did not remember. Another portion of the recording was played. Pittman then testified that she still did not remember, but she guessed that she saw him there. The State asked

if she saw defendant later that day (February 21), and Pittman did not recall. The recording was again played.

¶ 24    On cross-examination, Pittman acknowledged that one of her main concerns when she spoke to the police was avoiding being charged with murder. She stated that even after seeing her statements, she did not really recall the events surrounding the victim's murder. She testified that she may have taken ecstasy that night. She was also probably "drinking," because she "drank a lot."

¶ 25    The State's next witness was Stanley Turner. Turner testified that he was currently in custody in the Winnebago County Jail on charges of armed robbery, being armed habitual criminal, unlawful possession of a weapon by a felon, and unlawful restraint. He acknowledged having previous criminal convictions as well. Further, Turner had been charged with first-degree murder in relation to the crime at issue here. In accordance with a deal with the State, Turner was allowed to plead guilty to second-degree murder, for which he served seven years' imprisonment.

¶ 26    Turner testified that he was a friend of the victim. He also knew defendant, referring to him as an "associate." During the early morning hours of February 21, 2010, he, the victim, and David Weaver (a/k/a "Little David") were riding around and drinking on the east side of Rockford. They stopped at the Road Ranger on Eleventh Street. Turner stated that he intended to sell drugs to a few people. He did not know the name "Yavonna Pittman," but he was familiar with a woman called "Vonnie" (who was, in fact, Pittman). Vonnie drove a Chrysler 300. She was at the Road Ranger. Turner drove a red Bonneville. Pittman had arrived before they did.

¶ 27    Turner was adding brake fluid to his car. Pittman got into the car and sat in the driver's seat. She spoke with the victim and Weaver for a while and then got out. The victim went with her and got into her car. Weaver stayed with Turner, and they continued to drive around. About

15 or 20 minutes after they left the Road Ranger, defendant called and asked Turner to pick him up. They did so.

¶ 28 Turner, defendant, and Weaver drove around and eventually went to South Street (the crime scene), which was on the north side of the Orton Keyes complex. Turner stopped because he thought they were there to sell someone drugs. Defendant got out, but Weaver remained in the car. Turner heard a gunshot. He looked in his rear-view mirror and saw a body on the ground. Turner testified that he saw defendant shoot the victim. Defendant returned to Turner's car. Defendant directed Turner to drive to the river. Defendant had a gun with him, which Turner stated was a ".40 caliber lemon squeeze." When they got to the river, defendant disassembled the gun and threw it into the river. Turner dropped defendant off a short time later. Turner saw defendant the next day. Turner told defendant that he "didn't see nothing."

¶ 29 On cross-examination, Turner acknowledged that later on the day of the murder, he was arrested for trespassing at the Orton Keyes complex. He also had other serious drug charges pending against him. He did not recall the statement he made to detectives when he was first interviewed about the murder. However, on February 23, 2010, he did relate to detectives the same events to which he testified in court. He also told detectives that the victim was having a dispute over money with someone called T-Bone. Turner denied knowing that defendant was also known as C-Bo. At trial, he acknowledged that this was a lie, as was his statement to the police that he had not driven his car on the day of the murder. Had he been convicted of the murder, Turner was facing a sentence of natural life in prison. Turner acknowledged that it was "pitch black" and the rear window of his car was heavily tinted when he observed defendant commit the murder in the rear-view mirror. After he dropped defendant off, he went home.

¶ 30    The State next called Detective Mark Jimenez.  He testified that he was one of the lead investigators of this case.  In the course of his investigation, he spoke to Brett Merriman in the Tazewell County jail on March 31, 2010.  Jimenez identified a CD that contained an audio recording of this interview.  Defendant objected to the admission of the CD.  The State responded that it was not asking that the CD be published to the jury.  Merriman told Jimenez that defendant came to see him at the Marriott Hotel in Rockford.  Jimenez stated that he spoke with Pittman on April 27, 2010, at the Rockford Police Department.  A DVD recording was made of that interview. He also conducted interviews of Turner on three occasions.

¶ 31    On cross-examination, Jimenez testified that at one point, they searched Turner's girlfriend's home.  They discovered a large amount of ammunition in a black duffel bag, the majority of which was .40 caliber.  However, they did not recover a weapon of that caliber during their search.

¶ 32    Following Jimenez's testimony, both parties rested.  During deliberations, the jury asked two questions of the trial court.  The first was whether guilty or not guilty were its only options. The trial court responded affirmatively.  Second, the jury asked, "Can we see the video of [Pittman] that was shown in court?"  The trial court responded—with the agreement of the parties—that the jury had all of the evidence and exhibits and that it should continue its deliberations.  The jury found defendant guilty of first-degree murder and being an armed habitual criminal.  It further found that defendant personally discharged a firearm that caused the victim's death.  Defendant was sentenced to consecutive terms of 75 and 20 years' imprisonment.  This appeal followed.

¶ 33                             III. ANALYSIS

¶ 34    On appeal, defendant raises two main arguments.  First, he complains of the trial court's decisions to allow certain recordings of witnesses' statements to be played in front of the jury.

Second, he argues that it was error for the trial court to allow the State to present evidence that defendant was wearing a bulletproof vest at the time he was arrested. Finally, we will consider whether the purported error in this case was harmless.

¶ 35    Initially, we note that both issues were properly preserved. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). For example, when the State first attempted to refresh Pittman's recollection by playing her recorded statement in the presence of the jury, defendant objected, explaining during a sidebar that though it was acceptable to refresh her recollection, the recording should not be published to the jury. The State countered that it would be permissible if Pittman adopted the statement and that if they were to play the recording outside the presence of the jury, "we would be here all day." The State attempted to lay further foundation for the recording, and another sidebar was held, at the conclusion of which defendant reiterated, "This is still over my objection." Similarly, when Pittman was allowed to read from a written statement, the trial court stated that it was allowed "over objection." When the State wanted to play another portion of the recorded statement, defense counsel stated, "I still object with the same objection we've been discussing." Later, regarding another portion of the recording, defense counsel interposed the same objection. Thus, though, defense counsel may not have interposed an objection at every possible point, defense counsel made it abundantly clear that he continued to object to the State's method of refreshing Pittman's recollection. A similar pattern of objections was interposed during Merriman's testimony. Defense counsel also filed a motion *in limine* seeking to exclude evidence that defendant was wearing a bulletproof vest when apprehended. We also note that these issues were included in defendant's posttrial motion. Accordingly, these issues were properly preserved for review.

¶ 36    As this appeal involves two evidentiary issues, the abuse-of-discretion standard of review applies. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). An abuse of discretion occurs only if no reasonable person could agree with the trial court. *People v. Farris*, 2012 IL App (3d) 100199, ¶ 26. Where reasonable persons could disagree as to the propriety of the trial court's actions, no abuse of discretion occurs. *Id.* We review the result at which the trial court arrived rather than its reasoning. *People v. Johnson*, 208 Ill. 2d 118, 128 (2003). It is axiomatic that we can affirm on any basis apparent in the record, regardless of the reasoning relied on by the trial court. *People v. Walker*, 2018 IL App (1st) 160509, ¶ 23. Defendant, as the appellant, bears the burden of affirmatively demonstrating error in the proceedings below. *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 48. Accordingly, it is defendant's burden here to show that no reasonable person could agree with the trial court's decisions.

¶ 37                                    A. THE RECORDINGS

¶ 38    Defendant contends that the trial court should not have allowed portions of the recorded statements of Pittman and Merriman to be played in front of the jury. He also complains of the manner in which a written statement made by Pittman was used. At trial, defendant argued that, under the guise of refreshing the witnesses recollections, the trial court essentially permitted the State to "publish[] evidence that had not been admitted into evidence to the jury." Defendant attacks the trial court's rationale that this evidence was admissible for "demonstrative purposes." See *People v. Taylor*, 2011 IL 110067, ¶ 32 ("[Demonstrative] evidence has no significance apart from the ability to illustrate something testified to by a witness."). Defendant also criticizes what he terms the State's "*post-hoc* assertions" that the recordings were admissible pursuant to the past-recollection-recorded exception to the hearsay rule. See Ill. R. Evid. 803(5) (eff. Sept. 28, 2018).

¶ 39    Regarding the propriety of the use made of the recorded statements during the trial, defendant asserts: "This case involves the convoluted intersection of multiple evidentiary principles." Defendant first notes that hearsay is generally inadmissible unless the statement at issue falls within an established exception to the hearsay rule. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1107 (2009). Hearsay is an out-of-court statement offered for the truth of the matter asserted. *Id.* at 1106. Unless admitted in accordance with an established exception, hearsay statements may not be used as substantive evidence. *People v. Simpson*, 2015 IL 116512, ¶ 27.

¶ 40    At issue here are two evidentiary rules. The first doctrine at issue concerns refreshing the memory of a witness. See Ill. R. Evid. 612 (eff. Jan. 1, 2011). It is axiomatic that "the manner and mode of refreshing a witness' memory rests within the discretion of the trial court." *People v. Shatner*, 174 Ill. 2d 133, 153 (1996). "It has long been the law of Illinois that a witness may refresh his recollection from virtually any source." *People v. Pappas*, 66 Ill. App. 3d 360, 374 (1978). Before a witness's memory can be refreshed, it must be established that the witness's memory regarding the events at issue has been exhausted. *People v. Olson*, 59 Ill. App. 3d 643, 647 (1978). Once a witness's memory is refreshed, he or she may then testify based on their own, independent recollection. *People v. Cantlin*, 348 Ill. App. 3d 998, 1003 (2004). If the attempt to refresh the witness's memory is not successful, the material used in the attempt may be admissible as a past recollection recorded (Ill. R. Evid. 803(5) (eff. Sep. 28, 2018)) subject to certain foundational requirements. *Id.*

¶ 41    A past recollection recorded is defined as follows:

"A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the

witness' memory and to reflect that knowledge correctly." Ill. R. Evid. 803(5) (eff. Sept. 28, 2018).

The foundational requirements for a past recollection recorded are as follows:

"(1) the witness had firsthand knowledge of the recorded event; (2) the written statement was made at or near the time of the event and while the witness had a clear and accurate memory of it; (3) the witness lacks present recollection of the event; and (4) the witness can vouch for the accuracy of the written statement." *People v. Beasley*, 307 Ill. App. 3d 200, 207 (1999).

¶ 42 As an initial matter, we note that defendant's chief complaint is that the State was allowed to refresh the recollections of Pittman and Merriman by playing portions of their recorded statements in front of the jury. In itself, this does not establish an abuse of discretion. Defendant cites *People v. Garrett*, 216 Ill. App. 3d 348, 357 (1991), and *People v. Williams*, 240 Ill. App. 3d 505, 506-07 (1992), in support. In both cases, the State elicited hearsay testimony from police reports in open court before the jury. We have no quarrel with either case; however, they do not represent a categorical rule that a witness's recollection may never be refreshed by material that is made known to the jury. Indeed, in *Reed v. Northwestern Publishing Co.*, 124 Ill. 2d 495, 529-30 (1988), our supreme court found no abuse of discretion in circumstances somewhat similar to those present here:

"Plaintiff submits that quoting this prior testimony was an improper means of refreshing [the witness's] recollection. However, we agree with the numerous appellate decisions holding that the manner and mode of refreshing a witness' recollection is largely within the discretion of the circuit court. [Citations.] While it clearly would be a better practice to have the prior testimony recounted outside the jury's presence, so as not to

unduly emphasize certain testimony, we cannot say that the circuit court abused its discretion in permitting this verbatim recitation of an extremely brief portion of [another witness's prior testimony] testimony, testimony with which the jury was already familiar." We recognize that some differences exist between *Reed* and the instant case. Notably, *Reed* involved prior trial testimony and the material used to refresh was "extremely brief" whereas here the material used was more extensive. Nevertheless, *Reed* does recognize the extensive discretion the trial court possesses on such matters. More importantly, it stands for the proposition that it is not automatically error to refresh a witness's recollection by reading testimony (or, analogously, playing a recording) before the jury. Hence, we cannot say that no reasonable person could agree with the trial court's decision to proceed in this manner. In any event, we also find that much of the complained of material was admissible in accordance with the past-recollection-recorded exception to the hearsay rule.

¶ 43    Defendant points out that, "[t]hroughout his testimony, Brett Merriman said he recognized his voice on the March 31, 2010, recording but did not remember making the statements." The first such occasion defendant complains of is when Merriman was asked why defendant came to visit him at the Marriott where Merriman was staying. Merriman stated that he did not recall why defendant came to see him or whether defendant said anything "about his situation." He did not remember telling investigators that defendant stated he was "high," meaning that defendant was in some sort of trouble, due to the shooting of the victim. Merriman cited the passage of time and intervening head trauma. Defendant asserts (without citing authority) that this was insufficient to establish that Merriman's testimony was exhausted. Moreover, as defendant recognizes, throughout his testimony, Merriman expresses his inability to recall facts relating to the State's

questions. Defendant does not explain why a reasonable person could not infer from Merriman's repeated responses that his memory was exhausted regarding such matters.

¶ 44    Regarding the elements of a foundation for the admission of the recording pursuant to the past-recollection-recorded exception, we first note that it is apparent that Merriman had first-hand knowledge of the events described in the recorded statement, specifically, what defendant told him about the crime, which would have been admissible as an admission by a party (*People v. Aguilar*, 265 Ill. App. 3d 105, 110 (1994)). *Beasley*, 307 Ill. App. 3d at 207. In it, he describes his interactions with defendant. The second element is that the recording was made at or near the event at a time that the witness still had an accurate memory of it. *Id.* The recording was made about a month after the murder, which satisfies this prong. Regarding the fourth element, Merriman testified that he recognized his voice on the tape, those were his words on the tape, and he was being truthful when he made his statement. *Beasley*, 307 Ill. App. 3d at 207. A reasonable person could infer that he was vouching for the accuracy of the recording. Thus, the first, second, and fourth elements provide us with no basis to disturb the judgment below.

¶ 45    The third element, whether Merriman lacked a present recollection of the events (*Beasley*, 307 Ill. App. 3d at 207), is more complex. Much of the time, after the portions of the recording were played, Merriman persisted in testifying that his recollection had not been refreshed. It is reasonably inferable from such testimony that he lacked a present recollection of the events described in the statement. In other instances, Merriman testified that his memory was refreshed. In these instances, Merriman could testify from his own memory. See *People v. Jenkins*, 10 Ill. App. 3d 166, 171 (1973). Moreover, as explained above, defendant failed to show that no reasonable person could agree with the manner in which the trial court permitted Merriman's recollection to be refreshed. Accordingly, we find no basis to conclude that an error occurred here.

¶ 46    Regarding Pittman, defendant raises similar issues.  Defendant criticizes the use made of a written statement made on April 1, 2010, and a recorded statement made on April 27, 2010. Pittman testified at various times that she did not recall when asked questions by the State.  For example, when Pittman was asked whether she saw defendant when she dropped the victim off near the Orton Keyes complex and when was the next time she saw defendant after the murder, she stated she did not recall.  As far as attempting to refresh her recollection by playing a recording of her statement in front of the jury, as we discussed above, this is not a *per se* abuse of discretion, and defendant does not explain why no reasonable person could agree that this was acceptable. Additionally, a witness's memory must be exhausted as to the relevant facts before his or her memory may be refreshed.  *Olson*, 59 Ill. App. 3d at 647.  Pittman's repeated assertions that she did not recall answers to questions posed by the State would allow a reasonable person to conclude that her memory as to the facts relevant to the questions was exhausted.

¶ 47    Like Merriman, some portions of Pittman's recorded statement were admissible pursuant to the past-recollection-recorded exception to the hearsay rule.  Ill. R. Evid. 803(5) (eff. Sept. 28, 2018).  Again, the foundational elements of this exception are as follows:

> "(1) the witness had firsthand knowledge of the recorded event; (2) the written statement was made at or near the time of the event and while the witness had a clear and accurate memory of it; (3) the witness lacks present recollection of the event; and (4) the witness can vouch for the accuracy of the written statement." *People v. Beasley*, 307 Ill. App. 3d 200, 207 (1999).

Regarding the first factor, it is apparent from the events described in her recorded statement that Pittman had firsthand knowledge of them.  For example, she was asked if she saw defendant near the Orton Keyes complex or whether defendant told her to drive to that location.  These were facts

within her firsthand knowledge. Moreover, to the extent her statements contained things defendant told her, these would have been admissible as admissions by a party. See *Aguilar*, 265 Ill. App. 3d at 110. The second factor requires the statement to have been made at a time when her memory of the incident was still fresh; a reasonable person could conclude that her written statement made one month after the murder and her recorded statement made two months after the offense were sufficiently close to the occurrence of the murder. Further, a reasonable person could conclude that Pittman vouched for the accuracy of her statements. When asked whether her written statement was true and correct, she replied, "I'm guessing at the time yes." A reasonable person could interpret that as an affirmation. Similarly, she stated that she "wanted to be truthful" when she made her recorded statement.

¶ 48     Turning to the third element—that the witness lacks a present recollection of the facts at issue—we note that at times, Pittman testified that her memory had been successfully refreshed, which would render the past-recollection-recorded exception inapplicable (*People v. Pinchot*, 55 Ill. App. 3d 593, 595 (1977)). For example, after watching her recorded statement, Pittman testified that she recalled defendant coming to her house on either the night of February 20, 2010, or the morning of February 21, 2010. In such cases, the recording served to refresh Pittman's recollection. As noted above, while the better practice would have been to refresh her recollection outside the presence of the jury, we cannot say that no reasonable person could conclude that this was not a proper manner to proceed. Conversely, where the attempt to refresh Pittman's recollection was unsuccessful, the past-recollection-recorded exception applied, as a reasonable person could conclude that its elements had been satisfied.

¶ 49     Before leaving this section, we wish to express a strong word of caution to the bench and bar. Though we ultimately determined that no reversible error occurred here, had the record been

slightly different, we very well may have concluded that it was an abuse of discretion to play the recorded statements of the witnesses in the presence of the jury. Proceeding in the manner advocated by the State and sanctioned by the trial court in this case could have easily led to reversal in another case. Moreover, it was unnecessary, as there were alternatives of which the State could have availed itself. For example, the State could have simply had the recordings transcribed and used the transcript when it attempted to refresh the witness's recollections in the presence of the jury.

¶ 50 To conclude, defendant has not carried his burden on appeal of showing that no reasonable person could agree that the use of the statements of Pittman and Merriman was permissible.

¶ 51                               B. THE BULLETPROOF VEST

¶ 52 Defendant next argues that the trial court erred when it allowed the State to present evidence that he was wearing a bulletproof vest at the time he was arrested. Defendant was apprehended after a vehicular chase through Rockford. Two firearms were recovered from the car defendant was driving, and he was wearing a bulletproof vest. Defendant moved, *in limine*, to prohibit the State from eliciting evidence about the vest and the guns. The State agreed not to introduce evidence about the firearms. The trial court ruled that the State could introduce evidence regarding the vest. We review this issue using the abuse-of-discretion standard of review. *Harvey*, 211 Ill. 2d at 392.

¶ 53 Defendant asserts that the fact that he was wearing a bulletproof vest had "no bearing on the material issue in this case, which was the identity of the person who shot" the victim. He further suggests that "it was the novelty of the issue, rather than the relevancy, that prompted the [trial] court to allow evidence of the bulletproof vest." The trial court did, in fact, remark upon the uniqueness of this evidence. Regardless, defendant's point is not well taken. We review the

result at which the trial court arrived rather than its reasoning. *Johnson*, 208 Ill. 2d at 128. Hence, even if the trial court's reasoning was erroneous, it remains defendant's burden to show that no reasonable person could agree with its result. It is not sufficient for an appellant to attack the reasoning of the trial court.

¶ 54 Turning to that result, we note that all relevant evidence, unless excluded by some rule of law, is admissible. *People v. Turner*, 373 Ill. App. 3d 121, 127 (2007). Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Moreover, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Evidence is unfairly prejudicial if it places a defendant in a negative light for reasons unrelated to the case on trial. *People v. Prather*, 2012 IL App (2d) 111104, ¶ 24. Thus, we must answer two questions: (1) was evidence regarding defendant wearing a bulletproof vest relevant and (2) was it unfairly prejudicial.

¶ 55 As for the first question, a reasonable person could conclude that this evidence was relevant. It is well established that evidence of flight is admissible to show consciousness of guilt. *E.g.*, *People v. Harris*, 225 Ill. 2d 1, 23 (2007). By fleeing, a defendant manifests his belief that the police are seeking him. *People v. Lewis*, 165 Ill. 2d 305, 350 (1995) ("The inference of guilt which may be drawn from flight depends upon the knowledge of the suspect that the offense has been committed and that he is or may be suspected."). In a similar vein, a reasonable person could conclude that preparing for an adversarial encounter with the police shows consciousness of guilt as well. Further, a reasonable person could conclude that defendant was

preparing for such an encounter when he donned the bulletproof vest. *Cf. People v. Barrier*, 298 A.2d 138, 138-39 (N.Y. App. Div. 2002) ("Defendant was not deprived of a fair trial by evidence that he wore a body vest at the time of his arrest. In the context of other evidence received at trial, this constituted evidence of consciousness of guilt showing defendant's belief that he needed to protect himself from retaliation by the victim's family.").

¶ 56 The question of whether this evidence was *unfairly* prejudicial remains. Defendant contends that the admission of this evidence was erroneous as it was not relevant and it cast him in a negative light for reasons unrelated to the trial. As noted above, we do not agree that the evidence lacked relevance. Accordingly, its probative value must be measured against any unfair prejudice flowing from it. See Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 57 Defendant suggests that this evidence implied he was a dangerous person. A reasonable person could conclude that this is not a particularly compelling proposition, since bulletproof vests are not weapons and are defensive in nature. This is especially true given the State's decision to refrain from presenting evidence that two guns were found in the car that defendant fled in.

¶ 58 Moreover, a reasonable person could further conclude that the danger of unfair prejudice did not substantially outweigh this evidence's probative value. In *People v. Been*, 137 Ill. 2d 65, 109-110 (1990), our supreme court found the risk of unfair prejudice low in a murder trial where the State offered the defendant's prior convictions for two minor thefts into evidence. It explained, "First, these thefts were such minor crimes compared to murder that the jury would not have convicted defendant of murder on the basis that these thefts showed him to have a bad character." *Id.* Similarly, here, a reasonable person could conclude that there was no substantial risk that the jury would convict defendant of murder simply because he wore a bulletproof vest. Hence, though this evidence provided only incremental additional evidence of consciousness of guilt, as there

was evidence of defendant's flight in the record as well, a reasonable person could nevertheless conclude that any unfair prejudice did not *substantially* outweigh its probative value.

¶ 59    In short, we find this argument unpersuasive.

¶ 60                              C. HARMLESS ERROR

¶ 61    Assuming, *arguendo*, that defendant's claims of error are well founded, given the state of the record, we would conclude that they were harmless.  Where, as here, a defendant has properly preserved his or her claims of error, the burden is on the State to show that the error was harmless. *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 109.  The State can fulfill this burden by establishing beyond a reasonable doubt that the error did not contribute to the verdict or by showing that there is no reasonable probability that the jury would have found the defendant not guilty. *People v. Whitfield*, 2017 IL App (2d) 140878, ¶ 102.  We perceive no reasonable probability that defendant would have been acquitted but for the errors of which he complains.

¶ 62    The admissible evidence in this case was overwhelming.  Most compellingly, Turner testified that he witnessed the killing.  He stated he saw defendant shoot the victim through his rear-view mirror.  It is true that on cross-examination, Turner acknowledged that it was "pitch black" and that his rear window was tinted.  However, Turner also testified that defendant got out of Turner's car, Turner heard a gunshot, defendant returned to the car, and defendant had a gun with him.  These events occurred in the area where the victim was found.  Turner testified that the gun was a .40 caliber; Detective Shimaitis testified that a .40 caliber shell casing was found at the crime scene and Peters, the forensic pathologist, opined that the victim was shot at close range. Turner also testified that defendant disposed of the gun in the river.  Thus, even if Turner's view of the crime through his rear-view mirror was less than ideal, he testified to additional facts that

strongly implicated defendant. In addition, defendant's flight from the police showed consciousness of guilt.

¶ 63    We also note that not all of Pittman's and Merriman's testimony was objectionable. For example, Pittman testified that she recalled going to the Road Ranger station on the night of February 20, 2010, or the early morning of February 21, 2010. Moreover, we note that unlike Turner, Merriman was not an occurrence witness and, while Pittman testified as to defendant's and the victim's presence at the crime scene, she did not witness the murder.

¶ 64    Moreover, Turner testified to the events occurring at the Road Ranger prior to the shooting. He testified that Pittman was already at the Road Ranger when they arrived, driving a Chrysler 300. As he was adding brake fluid to his car, Pittman got in the front seat and spoke with the victim and Weaver. The victim left with Pittman. Thus, Pittman's statement regarding what occurred at the Road Ranger was largely cumulative of Turner's testimony. Thus, even if the statement was erroneously published to the jury, it did not prejudice defendant. See *People v. Colts*, 269 Ill. App. 3d 679, 689 (1993); see also *People v. Jackson*, 182 Ill. 2d 30, 75 (1998).

¶ 65    In sum, we see no reasonable probability that, had the statements of Pittman and Merriman not been played in front of the jury and had the evidence of the bulletproof vest been excluded, a different result would have followed. As such, these purported errors are harmless. *Whitfield*, 2017 IL App (2d) 140878, ¶ 102.

¶ 66                                IV. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 68    Affirmed.